733 A.2d 516 (1999)
323 N.J. Super. 391
James LoBIONDO, Jr. and Denise LoBiondo, Individually and t/a D. LoBi Enterprises, Inc., Plaintiffs-Respondents/ Cross-Appellants,
v.
Grace SCHWARTZ, Janice DeMarco, Karen Schwartz, and Marilyn Kallareou, Defendants-Appellants/ Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1999.
Decided July 7, 1999.
*518 Ira Karasick, Montclair and Frank Askin, Newark, for defendants-appellants/cross-respondents (Mr. Karasick and Joan Pransky, Montclair, attorneys and on the brief; Mr. Askin and Cathy Cardillo, Hoboken, on the reply brief).
Michele A. Querques, Middletown, for plaintiffs-respondents/cross-appellants (Giordano, Halleran & Ciesla, attorneys; Ms. Querques, of counsel and on the briefs; Steven M. Berlin, Princeton and Lynette J. Carhart, Morristown, on the brief).
Before Judges PRESSLER, BROCHIN and STEINBERG.
*517 The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a defamation and related-tort action brought by plaintiffs, James LoBiondo, Jr., Denise LoBiondo, and their corporation, D. LoBi Enterprises, Inc., against defendants Grace Schwartz[1] and her three adult daughters, Janice DeMarco, Karen Schwartz and Marilyn Kallareou. Grace Schwartz owns a house in Sea Bright, a municipality bordering the Atlantic Ocean. In 1986 plaintiffs bought a modest one-story beach club directly across the street from Mrs. Schwartz and proceeded over the next five years, both with and without required governmental approvals, to enlarge and to attempt to enlarge it substantially, both physically and functionally. Mrs. Schwartz and her daughters objected, rallying neighbors by distributing flyers and talking to them, appearing at planning board[2] and council meetings, and writing letters to municipal, county, and state officials complaining of plaintiffs' flouting of land use laws and state and local regulations. That activity was the basis of this suit, filed in October 1991, by which plaintiffs alleged defamation, intentional infliction of emotional distress and tortious interference with business advantage and sought both compensatory and punitive damages. Defendants counterclaimed, asserting causes of action sounding in malicious abuse of process, malicious prosecution, and intentional infliction of emotional distress.
This litigation, concluded five years later, took on an inexplicable and bizarre life of its own. Our careful scrutiny of this voluminous record persuades us that plaintiffs' complaint should have been promptly dismissed with prejudice on defendants' motion for summary judgment. In our view, and for the reasons we will explain, there was, as a matter of undisputed fact and well-settled principle of law, neither actionable defamation nor intentional infliction of emotional distress, nor tortious interference with business advantage. Defendants were exercising their constitutional right to participate in public debate, to express themselves regarding matters of public concern, and to petition governmental agencies and officers for redress of their legitimate grievances. Their speech was privileged, and they did not abuse their privilege. Nevertheless, years of litigation ensued, culminating in a two-week jury trial of the complaint in March 1996 and a second trial two weeks later on damages issues and resulting, astonishingly, *519 in a judgment against Grace Schwartz for both compensatory and punitive damages and a modest judgment in favor of two of her daughters on their counterclaims. We reverse the judgments entered upon the two jury verdicts, as modified by the court, in their entirety. We direct the dismissal of the complaint with prejudice. We remand for retrial of the counterclaim of all four defendants.

I
Defendants' self-protective actions forming the gravamen of this suit can only be understood in the context of plaintiffs' activities. In 1986 LoBiondo and his wife, through their corporation, bought the Surfrider Beach Club. It was then a modest one-story affair with a pool, lockers and cabanas, and a snack bar and was open only during daylight hours in the summer. Plaintiffs had plans to significantly expand the scope of the club's operations and to transform the physical structure as well. The first phase of their development, attended by what can only be generously characterized as Mr. LoBiondo's pattern of disingenuousness with local officials and neighbors, commenced in January 1987 and reached a conclusion of sorts at the Planning Board meeting of June 9, 1987. The intervening five months involved intense community opposition as well as ongoing debate within the Planning Board, which was itself philosophically divided by the insistence of some members on compliance with land use regulations and the expressed viewpoint of others that developing ratables was the Board's primary function.
In general terms, this is what happened. LoBiondo applied for a building permit in January 1987 for the stated purpose of placing new siding on the building and making roof repairs. He represented that the cost of construction was less than $2,500 and paid $15 for the permit. He promptly began construction to increase the height of the building. Since there was no permit covering any such construction nor, of course, any application therefor, the neighbors became concerned as to precisely what was happening at the club. The Planning Board was equally unaware and confessed its "embarrassment" with this state of affairs at its February 1987 meeting, which Mr. LoBiondo was asked to attend to explain his plans. Suffice it to say that between that time and the June 9, 1987, resolution of the Board, this much became clear. LoBiondo's plan evolved from repairing the roof and installing new siding to constructing a fully enclosed second-story area, referred to as the great room. At the February meeting, when only the second-story sundeck was proposed, the Board advised LoBiondo, who had brought only a hand-drawn sketch, that he required site plan approval with submission of proper and certified plans showing, for example, the weight-bearing capacity of the roof. He was permitted to proceed with the interior cosmetic work but told not to proceed with any exterior work until approval was granted. It appears, however, that he went beyond the terms of that instruction. We note that although this was LoBiondo's first foray into the beach club business, he had a college degree in business administration, had attended law school for two years and had previously submitted local land use applications.
At the March meeting, LoBiondo presented his great room concept, explaining that he was planning to use it for member buffets two or three times a week. He had brought with him "material" respecting the weight-load capacity, but had not submitted it prior to the meeting. He then requested a waiver of the site plan process, candidly admitting that "he felt the construction required no more than a building permit if it were being done in stages." Again the tension among the Planning Board members was palpable, illustrated by the observation of one that site plan approval for the addition of a second story was required "even if it were done in ten stages" and the comment of *520 another that "he would like to see the work continue." The resolution reached at that meeting required LoBiondo to submit a detailed set of plans to the township engineer for review and determination of the necessity for site plan approval, despite the Board attorney's opinion that site plan approval was necessary. The matter was carried to the April meeting, when the evolving elaboration of LoBiondo's plans was again discussed, albeit informally, because of LoBiondo's failure to provide adequate notice of the meeting. During the discussion LoBiondo represented that there would be no change in the use of the club "per se," that the great room would be used exclusively for members, that he planned karate and aerobic classes there as well as member buffets on Fridays and Saturdays, and that he was not planning any kind of public dining facility or licensed liquor service. Community objectors, including Mrs. Schwartz, were also heard. Another vocal objector was a Mrs. Viviano, who expressed concern with the planned height of the facility, its size, and most importantly, its lack of a sprinkler system.
Hearings continued at the May 12, 1987, meeting. Since the sealed plans had not been filed prior to the meeting, final site plan approval was withheld over LoBiondo's objection that his submission was complete. The Board instead granted approval conditioned upon the engineer's forthcoming report to be presented at the June meeting. LoBiondo again stated that he did not plan to obtain a liquor license or to install a public restaurant. He reaffirmed that there would be no cooking on the premises for the buffetthe food would be brought inand the snack bar kitchen would not be enlarged, and that all the club's new facilities would be for beach club members only. He also maintained that there were 258 parking spaces on the premises.
The Board's next meeting, on June 9, concluded the first phase of LoBiondo's expansion. The engineer's report listed twenty-five deficiencies in LoBiondo's plans. LoBiondo requested a waiver thereof, which was ultimately granted by the Board based expressly upon his numerous representations. First, he claimed that there were already 258 parking spaces and a 17-foot by 10-foot dumpster on the premises for refuse removal. He represented that his plans included no second-floor lighting because the club would be closing at 8 p.m. and the gates would then be locked. He then modified this to say that while the club would close at 8 p.m. in June and September, "it may be later in the summer months." One Board member opined that if LoBiondo "felt he needed additional lighting for insurance purposes he would have it." The Board also considered a letter from the building inspector stating that among other requirements the building meets "firematic standards of the Borough," an obviously incorrect statement because it was several years later that LoBiondo had actually hooked up the sprinkler system to a water supply. Again, LoBiondo repeated his no liquorno public dining representations. Finally, after the Board's vote granting final site plan approval based on these representations, one of Mrs. Schwartz's daughters, defendant Marilyn Kallareou, announced to the Board that she had just counted the parking spaces and there were less than 258. She also said the dumpster was only three feet by twelve feet. Members of the public, including Mrs. Schwartz and Mrs. Viviano, expressed their objections again. All to no avail. We further note that at trial LoBiondo admitted that prior to the June 1987 meeting he had hired a private investigator to talk to the objectors. LoBiondo further conceded that the detective was "wired" in order to surreptitiously record the conversations and that he did not disclose his true identity to the objectors.
Three days following the Planning Board's resolution granting site plan approval coupled with the waiver of the twenty-five deficiencies, LoBiondo filed *521 municipal court complaints against his adversaries, charging both Marilyn Kallareou and Grace Schwartz with acts of criminal trespass and harassment. He also filed a municipal court complaint against Mrs. Viviano, which he withdrew after a relative of hers interceded on her behalf. Mrs. Schwartz proved that she was not in Sea Bright when the conduct of which she was accused took place and was acquitted of the charges against her. Finally, LoBiondo withdrew the complaint against Marilyn Kallareou in exchange for Mrs. Schwartz's withdrawal of a noise complaint she had filed against the Surfrider in August 1988. We note incidentally that another neighbor, a Mrs. Twait, had written a letter to the editor of a local newspaper, published in October 1987, complaining of various litter and garbage left on the beach by the club. LoBiondo filed a municipal court harassment complaint against her too. She was acquitted at her municipal court trial after producing photographs substantiating the facts stated in her letter.
Mrs. Schwartz's 1988 noise complaint plays a significant role in this increasingly bizarre saga. In July 1988 LoBiondo had made the great room available to a member, Mrs. Springman, for a surprise birthday party for her husband. There were eighty guests and, by Mrs. Springman's admission, amplified music. At 11:30 p.m., Mrs. Schwartz, whose house was seventy-five feet from the club, called the police to complain of the loud noise at that hour. Shortly after midnight, the responding police officer arrived at the club. According to the report he contemporaneously filed, Mrs. Springman agreed to turn the music down and said that the party was just winding down anyway. By the time of trial eight years later, however, the officer was unable to recall that there was any noise when he arrived, despite Mrs. Springman's testimonial admission of the presence of eighty guests and a disc jockey. It is also significant to note that Mrs. Springman claimed to have been embarrassed by the police visit. She nevertheless did not cancel her membership at the club, although she and the ten other families with whom she had joined the club had decided prior to that event to join a different club the following season. She testified that she had met Mrs. LoBiondo by chance in the spring of 1989. Mrs. LoBiondo offered her discounts amounting to $3,000 on her club membership if she rejoined, and she and all ten other families in fact did so.
The next series of events leading to the filing of this action involved LoBiondo's effort to use the great room for a public year-round restaurant. To begin with, the borough's zoning ordinance had been amended in 1989 to eliminate restaurants as a permitted use in the district in which the Surfrider was located. We gather from the record that there were restaurants and nightclubs in the southern end of town that were not entirely trouble free, and the purpose of the amendment was to preserve the residential and family character further north. In any event, in apparent disregard of the new zoning restriction and obvious disregard of the numerous and repeated representations made in 1987 respecting the members-only use of the club, LoBiondo, in early 1990, began to plan a full-blown dining facility which he believed required only that he obtain a certificate of occupancy for that use. He so applied to the building inspector, Daniel F. Staehle.
The building inspector had information from his predecessor that the Surfrider had been previously inspected by the Department of Community Affairs (DCA), to whom Mrs. Schwartz had earlier complained and that the DCA had required an additional means of egress, exit doors swinging in the direction of the egress, panic hardware, exit signs, and a sprinkler system. The inspection disclosed that these requirements had still not been met and Staehle issued a building permit to LoBiondo in order to complete that work. Upon its completion, LoBiondo refiled for a certificate of occupancy for use of the *522 great room as a private dining facility. LoBiondo also applied for a municipal club liquor license, which was denied in May 1990. In the meantime, the building inspector was unsure whether the new use needed a variance or site plan approval. He did know that it required approval of the Monmouth County Board of Health which had not yet been given. As those events were occurring, public opposition, including Mrs. Schwartz's, was growing. The record leaves no doubt that in June 1990, after denial of the municipal club liquor license and while the borough officials were still considering whether a variance was required, LoBiondo sent a printed invitation to the public at large inviting membership in the Surf Club, a dining and dancing facility that would be open at the Surfrider in the summer daily from 6 p.m. to 2 a.m., and serving lunch and dinner in the off-season. The invitation also contained this egregious and blatant misrepresentation:
A private club liquor license has been approved by the State of New Jersey ABC. Currently we are waiting for approval from the town of Sea Bright, in the future, this will allow us to serve a full bar.
In light of the community uproar that attended these developments and the opinion ultimately rendered by the Planning Board's special attorney that a variance was required for this use, LoBiondo agreed to withhold its implementation until Planning Board approval was obtained. Accordingly, his attorney wrote to the Planning Board attorney on July 17, 1990, advising, in part, as follows:
Finally, I reviewed with Mr. LoBiondo the issue concerning the "Surf Club" flyer. My client agrees and acknowledges that any such use of Surfrider Beach Club can not occur until the Sea Bright Planning Board has had an opportunity to interpret my client's rights to make Surfrider Beach Club available to non-swim club members. Until the Planning Board has had an opportunity to fully review both the past use of Surfrider Beach Club and my client's plans for the future, Surfrider will not be made available to members of the public for non-swim club functions.
Despite the foregoing representation, LoBiondo, in February 1991, installed an Italian restaurant in the great room and a flyer was distributed in the area advertising that "Aniello's Italian Cuisine & Pizza Has Moved To The Surfrider Beach ClubDiningroom open to the public." The flyer also announced "Free Delivery." The Planning Board's specially retained attorney opined that a public restaurant with pizza takeout and delivery service required a use variance in view of the 1989 ordinance amendment, and finally LoBiondo agreed to stop the use until it was properly approved. LoBiondo then asked the Planning Board for an interpretation of the ordinance for the purpose of declaring that the public restaurant use was a prior nonconforming use based on the June 1987 site plan approval or, in the alternative, for use and bulk variances. That application was apparently scheduled to be heard at the March 12, 1991, meeting which was, however, canceled for lack of a quorum. The application was heard by the Board on April 23, 1991, and, incredibly, the prior non-conforming use interpretation requested by LoBiondo was granted.
Mrs. Schwartz promptly filed an action in lieu of prerogative writs in the Law Division complaining of the Planning Board interpretation action as arbitrary, unreasonable and capricious. The matter was heard by Judge Theodore Labrecque, who reversed the Board's action by oral decision rendered on April 28, 1992, of which we take judicial notice. N.J.R.E. 201(b)(4). Judge Labrecque reviewed the Planning Board minutes of the February to June 1987 meetings and of the 1990 and 1991 Planning Board minutes as well as the other municipal actions that we have described. Based on essentially the same record that was before the court in this *523 action, Judge Labrecque reversed the Planning Board determination that LoBiondo had a valid non-conforming public restaurant use based on the 1987 site plan approval. This, in part, is what he said:
This court has analyzed and scrutinized Mr. LoBiondo's 1987 and 1991 testimony and is somewhat overwhelmed by the fact that the sworn testimony in 1987 is impeached by the sworn testimony of 1991. Additionally, Mr. LoBiondo contradicted his testimony in several places. This court has tried to square the board's findings with Mr. LoBiondo's 1987 and even the 1991 testimony and has difficulty doing so. In 1987 Mr. LoBiondo gave testimony which clearly, unambiguously and unequivocally stated his position that there would be no public restaurant on his premises. This court also adds to this the fact that there were several neighboring landowners who gave testimony directly opposite to that of Mr. LoBiondo in the 1991 hearing.
This court must also look to the fact that there was no 1987 site plan application or approval for a public restaurant on the second story of Surfrider. Even though a restaurant was a permitted use in a B-3 Zone in 1987, no such site plan application for this use was presented. This court is also confronted by Surfrider's failure to abide by the Sea Bright Ordinance sections dealing with public restaurants. While Surfrider may have satisfied the requirements of the ordinance sections pertaining to beach clubs, a different set of regulations are mandated for restaurants.
Mindful that this court cannot substitute its judgment for that of a planning board. This court is constrained to hold that on this record Surfrider has not demonstrated such a lawful restaurant use which should be accorded the safety of protections guaranteed by N.J.S.A. 40:55D-68 and as further defined by N.J.S.A. 40:55D-5 (a non-conforming use is a use or activity which was lawful prior to the adoption, revision or amendment of the Zoning Ordinance but which fails to conform to the requirements of the Zoning District in which it is located by reasons of such adoption, revision or amendment.)
Accordingly, this court finds that the Sea Bright Planning Board's determination that Surfrider had a lawful pre-existing, non-conforming use was arbitrary and unreasonable in light of all the evidence presented to it. The Board's decision is reversed.
This obviously retaliatory action against Grace Schwartz and her daughters was filed several months later.
Our recitation thus far has told the undisputed story of plaintiffs' actions. What did defendants do to subject themselves to five years of litigation, and what did Grace Schwartz do to deserve a compensatory and punitive damages verdict against her? She composed and distributed flyers seeking community support. She spoke repeatedly to municipal officials in an effort to learn the true facts, to insist upon their adherence to the law, and to attempt to influence their discretionary decisions respecting LoBiondo's applications. When she found them unresponsive, she sought assistance from state officials, primarily the DCA.
In our factual review of this record, there is one more matter to be mentioned. Plaintiffs, as we have noted, purchased the beach club in 1986, and the summer of 1986 was their first summer of operation. Mrs. Schwartz had then been a member of the club for some time, and the previous owner had extended to her, as a neighbor, various courtesies including permitting her grandchildren, who visited occasionally, to swim at the club as part of her membership. The first time her grandchildren came to swim under the new ownership, Mrs. LoBiondo turned them away since they had no membership cards and instructed them to have their grandmother, Mrs. Schwartz, contact her. Mrs. Schwartz went to the club the following *524 week, where she was told by Mrs. LoBiondo that she could have a discounted membership for herself but that she would have to buy guest books for all the members of her family. Mrs. LoBiondo alleged that Mrs. Schwartz became angry, uttered profanities and finally threw $100 in cash at Mrs. LoBiondo. Mrs. Schwartz never thereafter used the club. It was plaintiffs' assertion that this episode was the cause of Mrs. Schwartz's subsequent ill will and explained what they regarded as her unjustified campaign against them.
The jury, evidently impressed by this ill-will evidence, disapproved of all of her anti-LoBiondo activities. Although it found no tortious conduct by Janice DeMarco, the only one of the three daughters who remained in the case when it went to the jury, it did find, by its answers to detailed interrogatories, that Mrs. Schwartz had defamed "any of the plaintiffs," that she had intentionally interfered with D. LoBi's business, and that she had intentionally caused mental anguish to Mr. LoBiondo. It further found that LoBiondo was not entitled to compensatory damages but was entitled to punitive damages and that D. LoBi was entitled to compensatory damages of $66,300 for defamation and $30,000, later reduced by the judge to $3,000, for business interference, but not to punitive damages.

II
We address first the defamation claim. It was based on seven documents written by Mrs. Schwartz between October 1990 and October 1991[3] which the judge held not to constitute defamation per se but to be capable of a defamatory meaning. These documents consist of five letters and two flyers, all of which are reproduced in the appendix to this opinion. We describe them briefly.
All seven documents deal essentially with LoBiondo's 1990 plan for the dining-dancing club and his 1991 unauthorized installation of the Italian restaurant in the club. The first of the flyers solicited opposition to LoBiondo's restaurant plans that were initially scheduled for consideration at the March 12, 1991, canceled meeting, and the second continued that opposition and complained of the last-minute cancellation of that meeting. The letter of January 21, 1991, addressed to Mr. Robert Hilzer, an attorney at the DCA, registered a complaint against the Sea Bright building inspector, Mr. Staehle, and his predecessor for the manner in which they handled, or failed to handle, LoBiondo's development plans and, particularly, his efforts to establish a public dining facility in the great room.[4] Her complaint that, at the least, a variance was required was, as later proved by Judge Labrecque, entirely correct. The letter to Mr. Hilzer of March 3, 1991, does nothing more than reiterate, in layman's language, the contents of her enclosed attorney's letter to the Planning Board attorney. Her complaint about the private dining club invitation with its liquor license misrepresentation and her objection to LoBiondo's application for an interpretation or variance were essentially factual. The thrust of the April 15, 1991, letter to Mr. Hilzer is her criticism of the building inspector. The fourth letter is addressed to Mr. Fox, the attorney retained to represent the Planning Board in connection with LoBiondo's interpretation application. Again the complaints were primarily about the municipal officials and the letter enclosed two letters LoBiondo's attorney had written to Mr. Fox, one in 1990, from which we quoted earlier, and the other in 1991. The fifth letter is addressed to the Department of Transportation and was written shortly after the Planning Board's *525 favorable interpretation action. It complains of the municipal action, reviews some of the history of the Surfrider since 1987 with a fair degree of accuracy, and asks if any help can be given by the Department.
We are convinced that this case should never have gone to the jury in the first place.[5]
The non-actionability of these seven documents in the context of the undisputed facts is, in our view, too obvious to require an extended exegesis of the current law of libel. Certain well-settled principles must, however, be stated. To begin with, the present state of the law of libel is based upon reasonably accommodating the tension between the constitutionally guaranteed right of free speech and personal reputational interest. Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 135-136, 516 A.2d 220 (1986). That accommodation must be heavily weighted in favor of the right of free speech when its subject is a matter of public concern reasonably invoking public debate. After all, public participation in issues of public concern is at the very essence of democracy. As the United States Supreme Court expressed in New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L. Ed.2d 686, 701 (1964), we have a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L. Ed.2d 789 (1974). The courts of this State have repeatedly embraced that principle and have accordingly granted heightened and solicitous protection to the exercise of speech in the public arena. See, e.g., Costello v. Ocean County Observer, 136 N.J. 594, 614, 643 A.2d 1012 (1994); Sisler v. Gannett Co., 104 N.J. 256, 271, 516 A.2d 1083 (1986); Kotlikoff v. The Community News, 89 N.J. 62, 73, 444 A.2d 1086 (1982). The United States Supreme Court has also made it clear that special protection must extend as well to the right of citizens to petition government for redress of grievances, a subject we address more fully hereafter. See City of Columbia v. Omni Outdoor Advertising Inc., 499 U.S. 365, 379, 111 S.Ct. 1344, 1353, 113 L. Ed.2d 382, 397 (1991). See also Fraser v. Bovino, 317 N.J.Super. 23, 37, 721 A.2d 20 (App.Div.1998), recognizing "the fundamental values that undergird a citizen's right to communicate on issues of public import."
It is, of course, clear that except in those limited circumstances to which absolute immunity applies, the right of free speech is not so unconditional as to negate entirely the private reputational interest. As we explained in Bainhauer v. Manoukian, 215 N.J.Super. 9, 31, 520 A.2d 1154 (App.Div. 1987), the actionability of defamatory speech is based on fault on the part of the speaker, and "fault, by whatever standard it is to be measured, is as much an element of the cause of action as the defamatory publication itself." We also made clear that the applicable fault standard depends on the status of the person claiming to have been aggrieved. If the aggrieved person is a public official or other public figure, "the constitutionally mandated standard of fault ... is the defendant's knowledge that the defamatory statement is false or his reckless disregard of its truth or falsity"in other words, "actual malice" as defined by New York Times, supra. Ibid. Where private persons are aggrieved, however, a less stringent standard applies, and we must look to the law of occasional qualified privilege that "arises out of a legitimate and reasonable need, in particular situations, for private people to be able freely to express private concerns to a limited and correlatively concerned audience." Id. at 36, 520 A.2d 1154. To whatever extent ill will or spiteful *526 motive might defeat the claim of occasional qualified privilege, it is clear that these considerations are completely irrelevant to the higher actual malice standard of New York Times. See Greenbelt Coop. Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L. Ed.2d 6 (1970).
Thus, a threshold question in every defamation action is the fault standard to be applied. The actual malice standard applies not only to those having the actual status of a public official or other public figure but also to those whose actions or interests have so involved them in a matter of public interest that for purposes of speech respecting that matter, they must be regarded as public figures. They are the so-called limited public figures. As explained by Sisler v. Gannett Co., supra, 104 N.J. at 279, 516 A.2d 1083:
[W]hen a private person with sufficient experience, understanding and knowledge enters into a personal transaction or conducts his personal affairs in a manner that one in his position would reasonably expect implicates a legitimate public interest with an attendant risk of publicity, defamatory speech that focuses upon that public interest will not be actionable unless it has been published with actual malice.
The trial judge held that plaintiffs, as land use applicants, were limited public figures, and we are in complete accord. Their activities in respect of the construction and use of the Surfrider Beach Club were fairly and reasonably the subject of public interest. Consequently, even defamatory speech by persons having a legitimate interest in what was going on at the clubas Grace Schwartz obviously didis protected and non-actionable provided only that it was not uttered with actual malice, that is, neither known by the speaker to be false or uttered with reckless disregard of its truth or falsity. The speaker's ill will or spiteful motive is an irrelevant consideration.[6]
Courts have frequently addressed the subject of the exercise of free speech in local land use matters that evoke intense controversy and in which the feelings of objectors to particular development plans ordinarily run high. Thus in Greenbelt, supra, a case arising out of a local land use controversy, the Court made it perfectly clear that in public debate involving those issues, a distinction must be made between those purported statements of fact which may be subject to a defamatory meaning and "rhetorical hyperbole" which is understood by the audience to be no more than a "vigorous epithet" of disapproval and objection. 398 U.S. at 14, 90 S.Ct. at 1542, 26 L. Ed.2d at 14. To subject rhetorical hyperbolea form of non-actionable opinionarising out of controversial and deeply felt local land use issues to the consequences of actionable defamation would, the Court held, severely undercut our national commitment to free political discussion. As the Court explained,
"Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L. Ed. 1093, 1102. Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent imitations upon the permissible scope of such liability. (Footnotes omitted.)
[398 U.S. at 12, 90 S.Ct. at 1540-41, 26 L.Ed.2d at 13-14.]
The rhetorical hyperbole rejected by the Greenbelt Court as non-actionable was the statement that the developer was blackmailing the local officials.
*527 Following Greenbelt, all manner of epithets used in connection with public-interest issues have been classified as non-actionable rhetorical-hyperbolic opinion. Thus in Kotlikoff v. The Community News, supra, 89 N.J. 62, 444 A.2d 1086, the Supreme Court rejected actionability of the publication of a citizen's letter to the editor accusing the mayor of a "huge coverup" and conspiracy in his handling of an issue of public interest. It explained its ruling by relying on
the principle that pejorative statements of opinion are entitled to constitutional protection no matter how extreme, vituperous, or vigorously expressed they may be. Any statement that may refer to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that plaintiff was being accused of a crime. Language that could reasonably be understood as implying specific criminal acts on the basis of undisclosed factual allegations, ... does not fall within the Gertz protection.
[Id. at 71-72, 444 A.2d 1086.]
In this State, the rhetorical-hyperbole statement of opinion is characteristic of opposition to local land use issues because the public, by notice required to be served to those within two hundred feet of the site and by publication to the community at large, is invited to express its views. N.J.S.A. 40:55D-12. And our courts have uniformly extended solicitous protection to the expression of those views. Thus in Karnell v. Campbell, 206 N.J.Super. 81, 501 A.2d 1029 (App.Div.1985), the defendants, protesting plaintiff's proposed use of property, wrote letters accusing him of "rape" of the town and of such deliberate misrepresentation as to warrant prosecutorial investigation. The court, in affirming the summary judgment dismissing the complaint, restated the principle on which the trial court here relied, namely, that speech that is not defamatory per se may be deemed defamatory by a jury if capable of a defamatory meaning. Id. at 88, 501 A.2d 1029. But the court then explained that:
The question of whether the statement has a defamatory meaning does not even arise, however, unless the statement is an assertion or implication of "fact." Unlike false statements of fact, expressions of opinion, no matter how insulting, are actionable only if they imply the existence of undisclosed defamatory facts on which the opinion was based. While the opinion cannot be false, those undisclosed defamatory facts may be, thus subjecting the publisher of the opinion to liability. The rationale is that while "there is no constitutional value in false statements of fact," opinions, no matter how "pernicious," cannot be false and are therefore constitutionally protected as "ideas." Gertz v. Robert Welch Inc., 418 U.S. 323, 339-340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974). Therefore the court held in Kotlikoff, supra, 89 N.J. at 68-69, 444 A.2d 1086, that "pure" expressions of opinion on matter of public concern are not actionable.
[Id. at 89, 501 A.2d 1029.]
Finally, the court supported its reading of the challenged speech as non-defamatory with this statement that, in the context of this case, bears repeating:
The citizens of our state must be free, within reason, to speak out on matters of public concern. So long as they state the facts implicated fairly and express their opinions, even in the most colorful and hyperbolic terms, their speech should be protected by us. Of course, developers such as plaintiffs here are entitled to invoke their legal rights in a court of law to protect their good names. We nevertheless fear that no one will be left to carry the torch of criticism even when defendants like those in this case are vindicated, after they have withstood the financial and emotional rigors of litigation such as this. Indeed it may become too costly for ordinary citizens to exercise the right to free speech *528 which undergirds a democratic society. We are profoundly concerned with the chilling effect that plaintiffs' lawsuit in these rather unremarkable circumstances may have on other citizens who would ordinarily speak out on behalf of what they perceive to be the public good. We thus consider stringent scrutiny of claims such as plaintiffs' to be required. Like the court in Kotlikoff we are extremely "loathe to discourage that robust and uninhibited commentary on public issues that is part of our national heritage." Kotlikoff, 89 N.J. at 73, 444 A.2d 1086.
[Id. at 94-95, 501 A.2d 1029.]
We have consistently embraced these principles. See, e.g., Higgins v. Pascack Valley Hosp., 158 N.J. 404, 730 A.2d 327 (1999); Casamasino v. City of Jersey City, 304 N.J.Super. 226, 244, 699 A.2d 697 (App.Div.1997), rev'd on other grounds, 158 N.J. 333, 730 A.2d 287 (1999); Wilson v. Grant, 297 N.J.Super. 128, 136, 687 A.2d 1009 (App.Div.1996); Orso v. Goldberg, 284 N.J.Super. 446, 458, 665 A.2d 786 (App. Div.1995); Miele v. Rosenblum, 254 N.J.Super. 8, 17-18, 603 A.2d 43 (App.Div. 1991).
Considering the seven documents in this light, we are at a complete loss to understand what possibly is or could be deemed to be defamatory about them. We recognize that offensive remarks were made about plaintiff suggesting that he was not truthful in his dealings with the Planning Board and the public. There are three such statements, all dealing with LoBiondo's installation of the Italian restaurant in the Surfrider after his attorney represented to the Board that no public eating facility would be placed there without Planning Board approval. Two are in the letter of March 6, 1991, to Mr. Fox, the specially retained Planning Board attorney, in which Mrs. Schwartz said that she could believe that LoBiondo would "give such misinformation." She also said in that letter that LoBiondo "doesn't care to whom he lies." The third statement was in her letter to Mr. Hilzer of March 3, 1991, in which she claimed that "[t]his whole situation is full of lies and deception." The main thrust of these communications, however, was to complain to higher officials of the actions of the Planning Board, not directly of LoBiondo's. As we view the record, we are satisfied that, generally speaking, these communications constituted fairly accurate recitations of the history of the goings-on at the Surfrider. To the extent they express Mrs. Schwartz's commentary on and characterization of these events, we have no doubt that they fall into the opinion category of rhetorical hyperboleand exceedingly modest hyperbole at that. Beyond that, we note that what Mrs. Schwartz said about LoBiondo's untruthfulness was reiterated by Judge Labrecque, albeit a bit more elegantly, when he reviewed the 1990 and 1991 events a year later.
The undisputed facts attendant upon the ongoing controversy between LoBiondo and his neighbors, particularly Mrs. Schwartz, as documented by the relevant Planning Board minutes, convincingly demonstrate that the actual malice standard was not met here. There was enough evident truth in Mrs. Schwartz factual statements to preclude a finding that she made them knowing they were false or with reckless disregard of their truth or falsity. Finally, we note that the trial judge did not explain on the record the nature of the purported defamation and just which statements or innuendos were capable of a defamatory meaning. We conclude that there was none.
As we have pointed out, much of Mrs. Schwartz's activities and letterwriting, including most of the allegedly defamatory letters, clearly constituted petitions to the government for redress of grievances. We find her resort to state and other officials eminently reasonable in view of the lack of response by the local Planning Board to her complaints. The Board's majority was apparently so beguiled by the lure of a ratable that in their anxiety to accommodate plaintiffs' development plans, they *529 disregarded their statutory land use responsibilities. And, as we have said, the thrust of that petitioning was directed to the local officials' unresponsiveness. We are further convinced that since the subject of Mrs. Schwartz's petitioning was a public issue involving a limited public figure, no more stringent circumscription than the actual malice standard of New York Times applied, and that standard was clearly not met.
In this context we need not consider the applicability to defamation actions of the so-called Noerr-Pennington exception to anti-trust claims, which generally affords immunity from anti-trust liability to those who petition the government for redress. United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). We do point out, however, that the right to petition government for redress of grievances exists entirely independently of Noerr-Pennington, and indeed, the Noerr-Pennington doctrine itself seems to derive from that fundamental right. Accordingly whether exercise of that right accords immunity, absolute or qualified, or is merely subject to the actual malice standard of New York Times makes no difference here in respect of this defamation claim since there was no such actual malice discernible on this record. We do, however, refer again to Noerr-Pennington in our consideration of the other intentional torts here in issue and defendants' counterclaim.
We make this final observation with respect to the defamation claim. Our Supreme Court has repeatedly encouraged the use of summary judgment as a technique to dispose expeditiously of meritless defamation actions, thereby to lessen the chill that the institution of such actions inevitably has on the exercise of free speech. As Justice Clifford explained in Kotlikoff, supra, 89 N.J. at 67-68, 444 A.2d 1086:
The summary judgment device, as employed by the trial court here in the pre-discovery stage, winnows out nonactionable claims, avoids the expenditure of unnecessary legal fees, and discourages frivolous suits. We therefore encourage trial courts to give particularly careful consideration to identifying appropriate cases for summary judgment disposition in this area of the law.
See also Maressa v. New Jersey Monthly, 89 N.J. 176, 196, 445 A.2d 376 (1982), cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982); Molin v. The Trentonian, 297 N.J.Super. 153, 159-160, 687 A.2d 1022 (App.Div.), certif. denied, 152 N.J. 190, 704 A.2d 20 (1997), cert. denied, ___ U.S. ___, 119 S.Ct. 239, 142 L.Ed.2d 196 (1998). Insofar as we understand this record, defendants' timely summary judgment motion was denied because of the motion judge's misperception of the standard of fault to be applied and his consequent assumption that ill will and spiteful motivation were relevant. Determination of plaintiffs' limited public figure status and scrutiny of the documentary evidencethe Planning Board meeting minutes would have been enoughshould have mandated the grant of the motion. Indeed the text of the alleged defamatory writings themselves should have been enough.

III
We next address the jury's finding that defendant had intentionally interfered with the corporation's business advantage and had intentionally caused LoBiondo emotional distress. Plainly, both of those causes of action must fall with the defamation cause.
To begin with, we are satisfied that the claim of intentional interference with the corporation's business advantage is just plain silly. That claim, as it went to the jury, was predicated solely upon the Springman birthday party event that we described earlier. The fact of that matter was that LoBiondo had obtained site plan approval for the great room in 1987 on the *530 representation to the Planning Board, among other representations, that he did not require lighting for the second floor because the club's activities would not continue after dark. We assume that one of the twenty-five deficiencies that was waived when the June 1987 site plan approval was granted was a lighting plan. The Planning Board and the neighbors thus had a right to rely on that representation. In that context, Mrs. Schwartz was entirely justified in complaining when disturbing amplified music was still going on close to midnighta fact Mrs. Springman did not dispute. Mrs. Schwartz's complaint did not constitute intentional interference with plaintiffs' business. It was entirely self-protective and she had a right to make it. Moreover, the trial testimony of Mrs. Springman to which we have referred makes it clear that plaintiffs suffered no damage as a result thereof. Plaintiffs' decision to retain Mrs. Springman and her friends by offering membership discounts despite their unrelated decision to leave the club was their business determination. The cost thereof cannot be laid at Mrs. Schwartz's door.
The intentional interference claim requires reference once more to the Noerr-Pennington doctrine and its protection of the right to petition for the redress of grievances. As we recently pointed out in Fraser v. Bovino, supra, 317 N.J.Super. at 38, 721 A.2d 20, the Supreme Court in Snyder v. American Ass'n of Blood Banks, 144 N.J. 269, 296, 676 A.2d 1036 (1996), expressly left open the question of whether Noerr-Pennington immunity precludes tort liability. We nevertheless opined that "if the Court were presented with a matter such as this," namely a malicious interference claim against "those entitled to assert objections to a land use application," it would be unlikely to reject the applicability of the doctrine. Fraser, supra, 317 N.J.Super. at 38, 721 A.2d 20. We therefore concluded "that the same principles which form the basis of the Noerr-Pennington doctrine entitle those who have standing to object to land use applications to immunity from claims for damages based upon the exercise of their right to object." Ibid. Again, we need not reach that conclusion because of the otherwise patent lack of merit of the malicious interference claim here.
As to the intentional infliction of emotional distress, it is well-settled that that cause of action requires as an essential element that defendant's conduct must have been outrageous. As defined by Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988), (quoting Restatement (Second) of Torts, § 46 comment d) "[t]he conduct must be `so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" We cannot avoid the impression that if there were any qualifying outrageous conduct here, it was certainly not defendant's.
There is, however, a more fundamental reason why the two intentional tort claims here should have been dismissed with the defamation claim. As we explained in Bainhauer, supra, 215 N.J.Super. at 48, 520 A.2d 1154, if an intentional tort countthere, malicious interference is predicated upon the same conduct on which the defamation count is predicated, the defamation cause completely comprehends the malicious interference cause. That is to say, if the alleged defamation is not actionable, then its consequences are also not actionable because the conduct that caused those consequences was privileged. The Supreme Court has also so held in considering the interplay between defamation and intentional infliction of emotional distress based on the same conduct. See Decker v. The Princeton Packet, 116 N.J. 418, 432, 561 A.2d 1122 (1989), noting that "[t]here is, in other words, a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results." It would obviously be intolerably anomalous *531 and illogical for conduct that is held not to constitute actionable defamation nevertheless to be relied on to sustain a different cause of action based solely on the consequences of that alleged defamation. Thus, since there was no actionable defamation here, there can be no claim for damages flowing from the alleged defamation but attributed to a different intentional tort whose gravamen is the same as that of the defamation claim. There was, consequently, no basis for the prosecution of these two intentional tort claims.

IV
We next address defendants' counterclaim and their assertion, in the alternative, of their right to file an action sounding in malicious use of process in the event plaintiffs' action against them ultimately terminates favorably to them.[7] The counterclaim alleged two causes of action, a so-called SLAPP-back suit and intentional infliction of emotional distress. As we have already noted, Grace Schwartz's counterclaim was rejected in full by the jury. As to the counterclaim of her three daughters, the jury found that none of them had proved intentional infliction of emotional distress. The SLAPP-back counterclaim, also considered by the jury, resulted in a verdict in favor of two of the daughters. Defendant Karen Schwartz was awarded damages of $1,333, and Marilyn Kallareou was awarded damages of $660. In the second trial, Karen Schwartz was awarded an additional $14,743.75 for attorney fees and $1,767.00 for "infringement upon her constitutional rights." Marilyn Kallareou was awarded an additional $7,371.87 for attorney fees. Plaintiffs, in addition to their meritless cross-appeal from the compensatory and punitive damage awards against Grace Schwartz, which they claim were inadequate, have cross-appealed from the SLAPP-back suit awards. Defendants appeal from those verdicts as well.
We consider first the SLAPP-back counterclaim. SLAPP, an acronym standing for Strategic Lawsuits Against Public Participation, was coined by Professors George Pring and Penelope Canan in two 1988 articles. They asserted in those articles that there is an increasing and extremely troublesome national phenomenon of litigation being commenced by commercial interests for the purpose of intimidating ordinary citizens who exercise their constitutionally protected right to speak out. In this way, commercial interests seek to quell effective opposition. In other words, protesting citizens are being sued into silence. Ultimately prevailing in the litigation is not the pointrather the litigation exercise is undertaken in order to impose upon these citizens the expense and burden of defending a lawsuit against them. This phenomenon is consequently viewed as a serious and significant threat to the free, open and vigorous debate on public issues that the courts have so scrupulously protected as a bedrock principle of the First Amendment and as an imperative to a democratic form of government. George Pring and Penelope Canan, Strategic Lawsuits Against Public Participation, 35 Soc. Probs. 506 (1988); George Pring and Penelope Canan, Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches, 22 L. & Soc'y Rev. 384 (1988).
Since the publication of these articles, there has been extensive academic support of its theses and a wide variety of academic proposals for combating and counteracting the perceived dangers of SLAPP suits. There has also been some academic skepticism expressed regarding the scope and severity of the problem. See, e.g., Barbara Arco, Comment, When Rights Collide: Reconciling the First Amendment Rights of Opposing Parties in Civil Litigation, 52 U. Miami L.Rev. 587 (1998) *532 (arguing in favor of requiring attorneys to more closely adhere to ethical standards as a method for reducing the prevalence of SLAPP suits); John C. Barker, Common-Law and Statutory Solutions to the Problem of SLAPPS, 26 Loy. L.A. L.Rev. 395 (1993) (favoring deterrence of SLAPP suits through expedited judicial review); Joseph W. Beatty, Note, The Legal Literature on SLAPPS: A Look Behind the Smoke Nine Years After Professors Pring and Canan First Yelled "Fire!", 9 U. Fla. J.L. & Pub. Pol'y 85 (1997) (claiming that the public has overreacted to the perceived problem of SLAPP suits); J. Reid Mowrer, Note, Protection of the Public Against Litigious Suits ("PPALS"): Using 1993 Federal Rule 11 to Turn SLAPPS Around, 38 Nat. Resources J. 465 (1998) (arguing that the use of sanctions similar to Fed.R.Civ.P. 11 will reduce the problem of SLAPP suits); Thomas A. Waldman, Comment, SLAPP Suits: Weaknesses in First Amendment Law and the Courts' Responses to Frivolous Litigation, 39 UCLA L.Rev. 979 (1992) (rejecting the use of procedural remedies to reduce SLAPP suits).
The legislatures of thirteen states have expressly addressed SLAPP suits in various ways.[8] Legislation is pending as well in New Jersey, whose response was the introduction of companion bills in the Senate and Assembly, not yet enacted, affording a litigation immunity for citizens who make bona fide communications to a public entity regarding matters of public interest with which they are concernedin other words, the Noerr-Pennington approach.[9]
We have no doubt that the phenomenon of SLAPP suits is a very real one. The law reports of this state contain numerous opinions that, although not employing the acronym,[10] describe actions in which apparently meritless complaints alleging defamation and various other intentional torts such as infliction of emotional distress and interference with business advantage were brought for the apparent purpose of silencing citizen protest. And indeed much of that litigation was brought against persons opposing land use applications. See, e.g., Ward v. Zelikovsky, 136 N.J. 516, 643 A.2d 972 (1994) (slander suit against neighbor who called plaintiff a "bitch" and said "[t]hese people, they hate Jews" at a condominium association meeting); Fraser, supra, 317 N.J.Super. 23, 721 A.2d 20 (intentional tort claims by real estate agent against persons who were allegedly involved in thwarting municipal approval for a condominium project); Lake Lenore Estates v. Township of Parsippany-Troy Hills Bd. of Educ., 312 N.J.Super. 409, 712 A.2d 200 (App.Div.1998) (intentional tort claims by real estate developer against school board and its members based on a board member's opposition to its proposed project); Anastasio v. Planning Bd., 209 N.J.Super. 499, 507 A.2d 1194 (App.Div.) (civil rights action by real estate developer filed against planning board, most of its *533 members, and municipal planner for refusal to approve development plan), certif. denied, 107 N.J. 46, 526 A.2d 136 (1986); Karnell, supra, 206 N.J.Super. 81, 501 A.2d 1029 (defamation action against writers of letters objecting to the sale and development of property). This is so in other jurisdictions as well. See, e.g., Walters v. Linhof, 559 F.Supp. 1231 (D.Colo. 1983) (real estate developers filed defamation suit against individuals who wrote letters to land use department questioning their intent); Reddick v. Craig, 719 P.2d 340 (Colo.Ct.App.1985) (same); Allan and Allan Arts Ltd. v. Rosenblum, 201 A.D.2d 136, 615 N.Y.S.2d 410 (1994) (property owner sued adjoining landowner for defamation based on statements made at Zoning Board of Appeals hearing), appeal denied, 85 N.Y.2d 921, 627 N.Y.S.2d 319, 650 N.E.2d 1321, cert. denied, 516 U.S. 914, 116 S.Ct. 301, 133 L.Ed.2d 207 (1995); Swerdlick v. Koch, 721 A.2d 849 (R.I.1998) (landowners sued neighbor for defamation and emotional distress due to neighbor's surveillance and subsequent complaints to zoning inspector that landowners were illegally operating a business from their home).
Nor do we have any doubt that defendants made a prima facie showing that the LoBiondo action against them can reasonably be found to have been a SLAPP suit.[11] The issue before us then is the nature of the remedy available to defendants. Defendants candidly request us to create a new cause of action, the SLAPP-back suit. Their theory is that a citizen whose constitutional rights of expression and petition are attacked and impaired by litigation brought against them for the very purpose of effectively depriving them of these rights or retaliating against their exercise thereof are the victims of an actionable intentional tort permitting them to recover both compensatory and punitive damages. Apparently the trial judge accepted the viability of this new tort in submitting defendants' SLAPP-back counterclaim to the jury.
We, however, decline defendants' invitation to declare the existence of this new tort and to define its elements primarily for the reason that it is not necessary for us to do so in order to afford defendants an opportunity for vindication. We are convinced that under the present circumstances, the familiar cause of action of malicious use of process will do just as well. We are also mindful that the intermediate appellate court should ordinarily defer to the Supreme Court or to the Legislature with respect to the creation of a new cause of action. See Proske v. St. Barnabas Med. Ctr., 313 N.J.Super. 311, 316, 712 A.2d 1207 (App.Div.1998), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999); Coyle v. Englander's, 199 N.J.Super. 212, 219-220, 488 A.2d 1083 (App.Div.1985). And while we are convinced that SLAPP suits require counteraction, nevertheless we recognize the competing public interest in the accessibility of the judicial process, and we would be reluctant to create a tool *534 that might be then used to impair accessibility.
In any event, although we note that malicious use of process[12] traditionally has been a disfavored cause of action and consequently not much resorted to, its elements are well understood and well defined. The plaintiff in the malicious use of process action must prove that the original action complained of was brought without probable cause and was actuated by malice, that it terminated favorably to plaintiff and that plaintiff suffered a special grievance. See, e.g., Campione v. Adamar of N.J., Inc., 155 N.J. 245, 268, 714 A.2d 299 (1998); Penwag Property Co. v. Landau, 148 N.J.Super. 493, 500, 372 A.2d 1162 (App.Div.1977), aff'd, 76 N.J. 595, 388 A.2d 1265 (1978); Klesh v. Coddington, 295 N.J.Super. 1, 684 A.2d 504 (App.Div.1996), certif denied, 147 N.J. 580, 688 A.2d 1055 (1997); Tedards v. Auty, 232 N.J.Super. 541, 549, 557 A.2d 1030 (App.Div.1989). All of these elements can be satisfied here.
Thus we are satisfied that the proofs, which we have outlined in some detail, could be found by a reasonable trier of fact to belie probable cause for the bringing of this action. We are also satisfied that the element of malice may be met by a showing that the purpose of the suit was to retaliate against defendants for exercising their rights of expression and petition or to stop them from further exercise of those rights or both. That is to say, we regard the bringing of a suit for the primary purpose of impairing public participation in matters of legitimate public concern and thereby suppressing legitimate public debate and protest as per se malicious in this context. We do not think litigation whose primary intent is to infringe upon another's First Amendment rights can be otherwise regarded. As to the element of favorable termination, this suit has now been terminated.
The final element of the cause of action, special grievance, is somewhat problematical. Special grievance is an elusive concept. The best definition is offered by Penwag, supra, 76 N.J. at 598, 388 A.2d 1265. The Court there instructed that while the cost of defending the original action is recoverable as damages, it is not by itself sufficient to constitute a special grievance. Rather a special grievance "consists of interference with one's liberty or property." Ibid. In the context of litigation of this sort, we do not read "interference with one's liberty" as embracing only physical freedom of movement and hence as limited to restraint on that freedom. Rather, we interpret "liberty" as including the entire bundle of freedoms afforded by the Constitutionincluding freedom of speech and freedom to petition. And we are convinced that the challenge to those freedoms attendant upon the filing of what may be conveniently referred to as a SLAPP suit and the constraint the suit imposes upon the exercise of those freedoms, both intended and thereby achieved, constitute a sufficient interference with one's liberty to satisfy the special grievance element. We point out that it is not only the defendant in a SLAPP suit who suffers. The common weal is obviously impaired as well since the consequence of a SLAPP suit is not only to silence the defendant but to deter others who might speak out as well. Suppression of public debate on public issues and the placing of a priceoften a high oneon the right to petition for redress is, in our view, special grievance enough.
That leaves one final issue to be considered, namely, the reiteration in Penwag, *535 supra, 76 N.J. at 598, 388 A.2d 1265, of the rule that the malicious use of process cause does not lie until termination of the action and hence that a counterclaim alleging that cause of action may not properly be pleaded with the answer. Rather a separate suit must be instituted after favorable termination. In this case, that rule makes no material difference since the plaintiffs' action is now terminated. Our concern is that in a so-called SLAPP-back claim, the proofs supporting the SLAPP-back are likely in large measure to be congruent with or at least overlapping with a SLAPP suit that manages to survive summary judgment. This is because of the very nature of the SLAPP suit and the explanation of defendants' conduct that must be offered in defense of it. The intertwining of the SLAPP suit and the malicious use of process action complaining of it is not necessarily characteristic of other civil litigation and the malicious prosecution action it evokes. It appears to us that in the SLAPP situation, requiring essentially the same proofs to be presented a second time in a separate suit would inflict a second and gratuitous injury upon the SLAPP defendants as well as unduly burdening the courts with duplicative litigation, a result undermining the principles of the entire controversy doctrine with no offsetting benefit. Should the question have to be faced in the future, we would urge that consideration be given by our Supreme Court to relaxing the Penwag two-suit rule in SLAPP-back malicious use of process situations.
Finally, we are satisfied that even if we were to have recognized the SLAPP-back cause of action, the jury verdicts in favor of Karen Schwartz and Marilyn Kallareou would have to be set aside as well as the verdict finding no cause as to Grace Schwartz and Janice DeMarco. The simple fact is that trial of the counterclaim was so tainted by the errors in the trial of the complaint as to preclude confidence in any constituent element of the jury verdict. We leave to defendants' option the question of whether to pursue frivolous litigation attorney fees alone under N.J.S.A. 2A:15-59.1 or to proceed with a malicious use of process action, claiming attorneys fees as part of their damages.
The verdicts and judgments in favor of plaintiffs are reversed and we remand for entry of an order of dismissal of the complaint. The verdicts and judgments in favor of defendants Marilyn Kallareou and Karen Schwartz are set aside. We remand for further proceedings consistent with this opinion.

APPENDIX

GRACE SCHWARTZ

615 Studio Road Ridgefield, N.J. 07657
January 21, 1991
R.E.G. Affairs
Mr. Robert Helzer,
Dear Mr. Helzer,
I have a residence at 884 Ocean Ave. Sea Bright, New Jersey. I am registering a complaint against the Sea Bright Building inspector, Dan Staehle, and his predecessor, Bill Moore.
I have written Mr. Staehle as recently as January 2, 1991 for information regarding building permits etc. for renovations at the Surf-rider Beach Club in Sea Bright, N.J. in 1990, as had my lawyer, John Mullaney of Tinton Falls, N.J. He has ignored me again.
I am not surprised because I visited him almost every monday night at Borough Hall for the information, and all I got was a brush-off.
Mr. Bill Moore, of Sea Bright, the former building inspector, in 1987 when the first renovation of the Surf-rider began and a second story was added, a costly project, was achieved with a $15.00 permit. That is public knowledge.
In the spring and summer of 1990, with Dan Staehle replacing Bill Moore, the Surf-rider added a restaurant, heat, five

*536 APPENDIXContinued
air-conditioners on the roof and "catering". All in a residential area, with no regulatory hours, (and I asked Mr. Staehle about this). By the way, he didn't know. With all this, the neighbors within 200 ft. were never notified.
At a special town meeting called in August 1990 to discuss this, the Planning Board lawyer, Gary Fox, and Council lawyer Ed Stokes (who no longer represents Sea Bright) agreed Mr. Lo Biondo, the owner of the Surf-rider, had to apply for zoning and permits, etc. I have tapes of this meeting, plus many documents to substantiate my charges. Nothing ever came of that meeting.
The Surf-rider had a New Year's Eve party this past December, and I called the police. I spoke to Sgt. Manning. He told me he would gladly go in and shut Lo Biondo down, but never, never did the police get such orders.
It is not too soon to think of the coming season and in desperation, I ask you what to do.

GRACE SCHWARTZ 615 Studio Road Ridgefield, N.J. 07657
P.S. Mr. Helzer, I don't want you to think Mr. Staehle is not doing a good job. On the contrary, he boasted to my daughter and me, fees collected in four months by him were more than Bill Moore collected in a year.
Goodbut he is selective also, as was Mr. Moore. They both let Mr. Lo Biondo do whatever he wants at the Surf-rider Beach Club and they forgot they represent us too.
At that special meeting I mentioned, both lawyers told us, the neighbors that is, you can sue Mr. Lo Biondo in Freehold. To get them off the hook I guess.
I would think permits, etc. are a matter of public record, and requests are not uncommon, and I offered to pay for them.
I think the building inspectors have some explaining to do, and I hope you feel the same way too.
Very truly yours,
GRACE SCHWARTZ XXX-XXX-XXXX
page 2

GRACE SCHWARTZ 615 STUDIO ROAD RIDGEFIELD, NEW JERSEY 07657
March 3, 1991
Mr. R. Hilzer CN 816
Trenton, N.J.
Dear Mr. Hilzer,

Re: Surf-Rider Beach Club
I have enclosed my lawyer, Mr. Mullaney's letter to Gary Fox, lawyer for the Sea Bright Planning Board. It reflects Mr. Staehle's disregard for giving any information that might have helped me. I still don't have it.
Also included is the invitation for membership to Lo Biondo's restaurant. He told Gerald A. Griffin of the ABC it was not his, but his partner's. He does not have a partner. And they believed him, just as you did, "a snack-bar."
There is the notice of Lo Biondo's intentions March 12, 1991. Never, ever, were the neighbors notified within the 200 ft. Then and now Lo Biondo just has a permit for a snack-bar, although Mr. Staehle knew this, he issue a CO with just a letter from Martin Smith, planning board chairman. And you think he is better than Mr. Moore?
This whole situation is full of lies and deceptions. The mere fact that Alan Hinton (I remember his name now) went with Moore to your office, is on the planning board, and Lo Biondo's friend.
*537 The Surf-Rider is in a residential area, on a two-lane highway, Rte # 36. What can I do? Can you help me, please?
Very truly yours,
Grace Schwartz
special council meeting 7/2/1990 Staehle testified(never followed up)

GRACE SCHWARTZ 615 STUDIO ROAD RIDGEFIELD, NEW JERSEY 07657
March 6, 1991
Mr. Gary Fox Sea Bright, N.J.
Dear Mr. Fox,
Monday, March 1, I received the enclosed "notice of hearing". I called the Borough Hall March 4 and was told no application had been filed, it would not be heard because it was now eight days to the hearing.
I spoke to the Mayor at the Council Meeting March 5, and he suggested I go to Borough Hall today and get a formal notice it would not be on the agenda. Patsy Kelly said it would not be heard, but then Agnes came in with a big folder, it was Lo Biondo's file. Just old plans, she said. So I left.
I thought about it and returned to the Borough Hall later. I examined the file. And then I saw the letter to you and Mr. Smith from Mr. Wolpat. (enclosed).
I can't believe (oh, yes I can) Mr. Lo Biondo would give such misinformation, especially after that meeting we had July 2, 1990. And how soon Mr. Wolpat forgets, I have enclosed his letter to you as of July 17, 1990.
On my second visit to Borough Hall, I was told the agenda for the planning board was being changed. It had been removed from the bulletin board. I asked if Lo Biondo's case would be on March 12th. I was told they have the right NOT TO INFORM ME if it is or isn't to be heard until the night before hearing. That is what Agnes said. How do you like that?
It is my understanding from your interpretation on July 2, 1990 (enclosed) there are no conditional uses permitted in the B-3 Zone. There should be just a snack bar and beach club. You specifically said any other use beyond this would require variances.
Mr. Wolpat indicates Mr. Lo Biondi admits using the Beach Club for other numerous public events which you determined he is not entitled. All last summer I made complaints to you and Mr. Staehle concerning Lo Biondo's blatant disregard of the town's land use restrictions. To no avail.
Most recently, Lo Biondo had a New Year's Eve Party at the Surf-rider. I contacted Sgt. Manning that night. He said he would gladly go in and `shut him down' but never, ever had such orders been given. I asked him to record my complaint. Agreed.

GRACE SCHWARTZ 615 STUDIO ROAD RIDGEFIELD, NEW JERSEY 07657
April 15, 1991
REG. Affairs Trenton, N.J.
Dear Mr. Hilzer,

Re: Surf-rider Beach Club-Sea Bright, N.J.
Mr. Lo Biondo went before the Planning Board last Tuesdaynewspaper article enclosed.
All the neighbors attended and the planning board treated us like an inconvenience. It was in the bag. Mr. Hinton never said Mr. Lo Biondo gave him a 75th birthday party at the Surf-rider.
But my lawyer, Mr. Steib of Middletown, had a problem with Mr. Staehle. When he asked for permits, etc., Mr. Staehle ignored the request, until Mr. Steib threatened him with a "don't bother, I will get a subpoena." Even then, the information *538 was sketchy, but most were dated May 1990, and he waited until court day to give them to Mr. Steib. Included was a permit for a well-digger (now on the job), but with no explanation for its purpose or reason.
By the way, if Lo Biondo did not get this interpretation, he would have had to have site-plans, and also fifty more parking spaces, and that he could not do. He doesn't have enough now with all those extra cabanas and lockers, on the sea wall, and hanging on the parking lot bulkhead he built.
Only in America!
Very truly yours,
Grace Schwartz
With all our correspondence, did you ever do anything? And I never heard from Mr. Mraw either.
cc: Mr. Mraw enc.
P.S. A neighbor, Mr. Nelson, asked Mr. Lo Biondo when he was going to take the lockers off the sea wall (for the winter). He said he did not have to, Trenton said he could leave them there all year. Did you?

GRACE SCHWARTZ 615 STUDIO ROAD RIDGEFIELD, NEW JERSEY 07657
I have been in contact with the Bureau of Regulatory Affairs in Trenton since January 26, 1991. My contact is Mr. Robert Helzer, Esq., XXX-XXX-XXXX.He told me in December 1990, Mr. Moore was fined, for what, he did not say, but he did say Mr. Lo Biondo was there (Lo Biondo told him he didn't have a restaurant, just a snack bar). He doesn't care to who he lies. And from his description, so was Mr. Hinton there.
This is completely inappropriate and a conflict of interest. It creates an appearance of impropriety in light of his position on the planning board.
So whether there is a meeting on March 12th or not, I will just have to wait and see what `they' decide.
Very truly yours,
Grace Schwartz
enc.
It is not such an informal arrangement, (unless WHERE) it was arranged, this March 12th meeting. It has been published and Patsy Kelly read it.

GRACE SCHWARTZ 615 STUDIO ROAD RIDGEFIELD, NEW JERSEY 07657
April 24, 1991
Mr. P. Maiorano
New Jersey Dept. of Transportation
Freehold, New Jersey
Dear Mr. Maiorano:

Re: Surf-rider Beach Club, Sea Bright, N.J.
This was always a beach club, private, members only, a snack-bar, NO PIZZA, and we belonged. Cars had stickers, parking was at a premium, summers only.
When James Lo Biondo of Rumson bought it in 1987 (from Chubby Marks) he added a top floor and actually locked up the Ocean, and for members only, with badges and car stickers. There was much controversy. Then last June 1990, he installed four hugh air conditioners on the roof. Neighbors were so upset, so the Council and Planning Board called a special meeting. Gary Fox, the Planning Board lawyer, decreed Lo Biondo would have to apply for a variance, it was only a snack-bar. ENCLOSURE # 1
At the June 2, 1991 meeting, ENCLOSURE # 2 came to light. When confronted, Lo Biondo pleaded ignorance, "a manager did it".
In the meantime, Lo Biondo applied to the Council for a "Club Liquor License". He was turned down, but they did say, "you *539 are not there long enough". I felt they left the door open.
In March of this year, all the neighbors, within 200 ft. got a notice Lo Biondo was going to the Planning Board for an interpretation. We found out later, if he needed a variance, he would have to have 50 more parking spaces for a restaurant. An impossibility. He claimed at the meeting, the beach-club was never private, and he had a restaurant. Better still, Gary Fox, re-interpreted his original decree, in Lo Biondo's favor. A councilman said "a snack bar is a restaurant". Mayor Rooney said Lo Biondo never had a MERCANTILE LICENSE. It passed 5 to 4.
Last night I went to the planning board meeting, to hear the resolution read. It passed, with no stipulations as to hours,
signs, parking places, noise, lights, music. Butsomeone else's resolution was read, with stipulations for state, county, and borough laws. I questioned this (I never give up). The chairman, Mr. Smith, said, "it's about toilets". When I asked if the Surf-rider needed more toilets, Mr. Smith said he didn't know.
I have lots more, but enough for now. If you can help or direct me, I would appreciate it. Thank you.
Yours truly,
Grace Schwartz
Ridgefield phone 943-8472
Sea Bright, 884 Ocean Ave.
phone 842-1058

FELLOW HOMEOWNER & RESIDENT
SURFRIDER WANTS TO PUT A YEAR ROUND PUBLIC CLUB-RESTAURANT IN OUR RESIDENTIAL AREA.
HELP U.S. DEFEND OUR HOME AND DEFEAT THIS VARIANCE. WE DO NOT WANT THE TRAFFIC, THE NOISE, THE ODOR OF COOKING, THE MUSIC, 75 FEET FROM OUR HOMES.
PLEASE SUPPORT US.
TUESDAY, MARCH 12
7:30
WE NEED YOU AT THIS MEETING.

PLANNING BOARD CANCELS MEETING!
Martin Smith cancels March 12 meeting and hearing of Surfrider's request for a variance. Martin Smith says he did not have a quorum for Tuesday.
Martin Smith, Chairman of Planning Board, would not accept citizen's complaint of a restaurant, open to the public, already in the Surfrider. Already open for business. Not so!
Mayor Rooney is unreachablewho knows where his phone number rings.
Dan Staehle has a tape machine on.
The Planning Board has full knowledge of Aniello's restaurant in Surfrider.
Only your phone calls to Martin Smith, 747-6903, Dan Staehle, 988-6014, and City Hall complaining of this restaurantwithout permissionopen and operatingwill hopefully make City Hall SHUT IT DOWN.
NOTES
[1] "Mrs. Schwartz" refers in this opinion to Grace Schwartz.
[2] Sea Bright has a "combined" planning board and zoning board. See N.J.S.A. 40:55D-25c(1).
[3] That time period constituted the parameters of the alleged defamation by reason of the one-year statute of limitations in defamation actions. N.J.S.A. 2A:14-3. The period closed with the filing of the complaint.
[4] We note that Staehle's predecessor was in fact fined by DCA for his mishandling of LoBiondo's 1987 application.
[5] Since we conclude that plaintiffs' failed to present a prima facie, we will not address in full the numerous errors in the jury charge, although some reference will be made thereto.
[6] It is plain that a major error in this trial was the injection of Mrs. Schwartz's alleged ill will and spiteful motive against plaintiffs both as a matter of evidence and in the court's charge to the jury.
[7] Clearly, defendants were precluded from filing a malicious use of process claim until favorable termination of plaintiffs' action against them. See Penwag Property Co. v. Landau, 76 N.J. 595, 598, 388 A.2d 1265 (1978).
[8] Cal.Civ.Proc.Code § 425.16 (West Supp. 1997); Del.Code Ann. tit. 10, §§ 8136-8138 (Supp.1996); Ga.Code Ann. § 9-11-11.1 (Supp.1997); Ind.Code Ann. §§ 34-7-7-1 to -10 (West Supp.1998); Me.Rev.Stat. Ann. tit. 14, § 556 (West Supp.1997); Mass. Gen. Laws Ann. ch. 231, § 59H (West 1997); Minn. Stat. Ann. §§ 554.01 to -.05 (West Supp. 1997); Neb.Rev.Stat. §§ 25-21,241 to,246 (1995); Nev.Rev.Stat. § 41.640 to .670 (Supp. 1993); N.Y. Civ. Prac. L. & R. 3211(g) (McKinney 1997-1998); R.I. Gen. Laws §§ 9-33-1 to -4 (Supp.1996); Tenn.Code Ann. §§ 4-21-1001 to -1003 (1997); Wash. Rev. Code Ann. §§ 4.24.500 to .520 (West Supp. 1997).
[9] See S. 643, introduced in 1996 and referred to the Senate Judiciary Committee; A. 1545, introduced in 1996 and referred to the Assembly Judiciary Committee. Apparently neither bill was ever reported out by the respective Committee. They were refiled in the present session as Assembly Bill A-1194 and Senate Bill S-745 but have not yet been reported out by the Committees to which they were referred.
[10] But see Baglini v. Lauletta, 315 N.J.Super. 225, 228, 717 A.2d 449 (Law Div.1998) (noting that plaintiffs in the malicious use of process action there had referred to the prior suit against them as a SLAPP suit).
[11] Portions of LoBiondo's pretrial depositions were read into evidence during his cross-examination, and he conceded giving this answer to this question:

Q. Speaking of agenda, do you have an agenda in pursuing this suit that you have filed through your attorney against Mrs. Schwartz, do you have an agenda to silence her voice against concerns she has expressed about your premises?
A. Yes.
The following cross-examination ensued:
Q. Sir, did I read that correctly?
A. Yes.
Q. Did you mean that answer when you gave that during this deposition on January 31st, 1995?
A. Yes, I did.
Q. Do you still hold that agenda today as you sit here in this courtroom?
A. Yes, I do.
We further note that in his deposition LoBiondo was asked this question:
Q. Well, did you think it was a legitimate concern for a neighbor to have as to what your intentions were with regard to future use of the beach club?
He conceded at trial that his response was "No one's business, as long as it's a legal use."
[12] We use the term "malicious use of process" when the prior action complained of is civil, reserving the phrase "malicious prosecution" for prior criminal actions although the elements of the two causes are the same. See Penwag Property Co. v. Landau, 76 N.J. 595, 597, 388 A.2d 1265 (1978). Malicious abuse of process, as we understand it, requires that there must have been an improper act by the plaintiff after having obtained process. See, e.g., Tedards v. Auty, 232 N.J.Super. 541, 557 A.2d 1030 (App.Div.1989). That was not the case here.