232 N.J. Super. 541 (1989)
557 A.2d 1030
WILLIAM P. TEDARDS, JR., PLAINTIFF-APPELLANT,
v.
JON J. AUTY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted February 16, 1989.
Decided April 21, 1989.
*543 Before Judges BRODY and ASHBEY.
Norman M. Robertson, attorney for appellant.
Voorhees & Acciavatti, attorneys for respondent (William W. Voorhees, Jr., of counsel; Cynthia Goldman, on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
Plaintiff brought this action for abuse of process (a writ of ne exeat) in which the seeks compensatory and punitive damages from an attorney (defendant) who had represented plaintiff's former wife (wife) in post-judgment proceedings. Defendant had obtained the writ and used it to have plaintiff arrested *544 and incarcerated overnight until he posted a bond in the amount of $67,500, the full amount of the wife's demand. The spouses thereafter settled their dispute. The trial judge in the present action granted defendant's motion for summary judgment. He held that even if defendant had abused the ne exeat process, plaintiff was not harmed because the judge who had issued the ne exeat could properly have issued a capias ad respondendum on the evidence presented and produced the same result. We reverse.
An understanding of the issue on appeal requires some understanding of the dispute between the former spouses that prompted issuance of the writ.[1] They were divorced by a dual judgment entered in early March 1982 several weeks after a six-day trial in late January. The judgment provided for joint custody of their 12-year-old son, the only child of the marriage. Plaintiff had primary custody. The judgment required the wife to "pick up the child after school, give him supper and return him to the [Englewood] residence of the Father at 7:30 P.M." The boy stayed with each parent on alternate weekends. Plaintiff is a member of the bar of New York and Washington, D.C. When he had to be in Washington, he flew there and back the same day so that he could be home in New Jersey to receive the boy at 7:30 p.m.
The underlying dispute centered on disposition of certain residential real estate in Washington, D.C. that the spouses held as an investment. At the time of the divorce the property was encumbered with a mortgage having a balance of about $105,500. The judgment provides that the equity be divided into thirds, one-third to each spouse and one-third to defray the primary and secondary school expenses of their son who was attending a private school in New York City. However, the judgment is not entirely clear as to the amount of the wife's *545 share, when she would be entitled to receive it and how to dispose of any balance of the son's share when he completes secondary school.
The relevant provisions are as follows:
3. With regard to the Washington, D.C. residence, it has been stipulated that said residence has a net equity of $184,500.00. The [wife] shall execute a Proper Deed transferring all of her right, title and interest in and to the Washington, D.C. residence to the [plaintiff], said deed to be prepared by the [plaintiff] in a form valid and proper under the laws of the District of Columbia. Out of the stipulated net equity in the Washington, D.C. residence of $184,500.00 the [wife] shall be entitled to the sum of $61,500.00. The [plaintiff] shall be entitled to the sum of $61,500.00. The infant child of the marriage shall be entitled to the application of $61,500.00 which will be the remaining one-third (1/3) of the net equity to be applied towards his complete pre-college education.
* * * * * * * *
Depending upon the then financial condition of the [wife] and the [plaintiff] either party may make an application for further equitable distribution of those funds unexpended for the infant child's education and to delineate the responsibility for college costs for said child.
4. The [wife's] share of $61,500.00 shall carry interest at 13.5% per annum, but shall be paid to her no later than 6 months after the date of the Final Judgment. If not so paid the Washington, D.C. residence shall be placed on the open market for sale and the net proceeds thereof shall be divided in thirds, the [plaintiff] becoming trustee for the infant child for one-third (1/3) to be applied to said child's pre-college education as stated heretofore. Any balance remaining upon said child's graduation from High School shall be subject to application as heretofore stated.
Plaintiff apparently interpreted these provisions to mean that he had a choice of either paying the wife $61,500 for her share within six months after the date of the judgment or selling the property and paying her one-third of the proceeds of sale after discharging the existing mortgage. In either case, the wife was first obliged to convey to him her interest in the property.
In February 1982, after the trial but before entry of judgment, plaintiff moved for an order directing the wife to convey to him her interest in the Washington property. Plaintiff supported his motion with a certification in which he stated that he wanted to purchase the wife's interest in the property within the allotted six months and that he needed a deed from her so that he could "finance" the property "to raise the sufficient *546 funds due the [wife]." He added that he also needed the refinancing to pay personal debts and to maintain alimony payments. The wife thereupon conveyed to plaintiff her interest in the Washington property.
Plaintiff did not pay the wife $61,500 within six months after entry of judgment, nor did he list the property for sale during that period. He claimed that he could not afford to pay the wife her share, and could not sell the property for its fair value, as estimated at the time of the divorce, because of unanticipated extraordinarily high interest rates on real estate mortgages in 1982. The wife then engaged defendant, who had not previously represented her.
Defendant obtained an order in November 1982 directing plaintiff to pay the wife
within ten (10) days the sum of $61,500.00 and accrued interest in the amount of $6,437.28 as of November 1, 1982; and
IT IS FURTHER ORDERED that in the event that [plaintiff] shall fail to pay the [wife] her distributive share of the proceeds of the Washington D.C. residence within ten (10) days, the house is to be immediately listed for sale at a price of $184,500.00, the previously stipulated sum; ...
It is immediately apparent that this order did not bring matters to a head and was bound to cause problems. The sanction against plaintiff for not paying the wife $61,500 within ten days was merely to list the property for sale at a price equal only to the "net equity" stated in the divorce judgment. If "the net proceeds" of the sale were arrived at by reducing the sales price by the $105,500 mortgage balance at the time of the divorce and further reducing it by the costs of sale, the wife's one-third share of a $184,500 sale would be substantially less than had been anticipated under the judgment.
We are told that defendant, on behalf of the wife, moved for relief again the following year. The motion produced a June 1983 order, which we have not been given. Plaintiff certified in this action that the June order identified several matters to be adjusted between the parties "in either a settlement negotiation or a plenary hearing." We gather that whatever it provided, *547 the June order was not effective because defendant again moved for relief in August 1983. In response to that motion plaintiff certified that
3. I hereby represent to this Court that a closing date for the sale of this property is scheduled for August 4, 1983, at a gross sales price of $295,000.00. While a final accounting of the costs attendant to this closing is still in process, I estimate that the net proceeds from this sale will not exceed $272,000.00 after all fees, including realtors' commission, maintenance, and closing fees and expenses associated with the sale are deducted.
4. The current encumbrances on the property of which the Court was aware at the time of the final Judgment of Divorce total approximately $105,500.00. After deducting the costs attendant to the closing, the net equity in this house is approximately $167,500.00. As a result, [the wife's] share of that equity will not exceed $56,000.00, according to the best estimate that I am currently able to give. I would hope to obtain and make available to the [wife] the majority of her share by the second week in August.
Defendant apparently did not pursue the motion, presumably because the closing was imminent.
After the closing, plaintiff paid the wife $20,000. He explained in a certification filed in opposition to defendant's motion for summary judgment in this action how he had proposed to pay her the balance:
After completing the sale, I paid [the wife] an initial $20,000 and told her that we should negotiate a final resolution of the several outstanding issues. I told her that my estimate of her remaining net distribution from the Washington home was about $33,000 plus some interest. I asked her to prevail upon her attorney to cooperate in negotiations with my attorneys.
One evening in November 1983, before these issues were resolved, plaintiff was arrested at his home in Englewood by police officers executing the ne exeat that defendant had obtained ex parte.
The wife's affidavit in support of the application for the writ states, in part, the following:
13. [Plaintiff] presently works and lives in Washington, D.C. and he returns to New Jersey on a weekly basis to see our son.
14. Other than our son, he has no ties in this state as his family comes from the south. He has indicated to me on numerous occasions previously when motions were brought against him that if the Court entered an Order for his arrest, he would not appear but remain in Washington.
15. In point of fact, on several occasions, when the Probation Department was attempting to secure his appearance for the purpose of paying arrearages, *548 he remained in Washington, D.C. and refused to come to the State of New Jersey to acknowledge his obligations.
In his certification below, plaintiff stated in some detail that defendant knew the wife's certification was false in several respects, including the statement that he lived in Washington, and not in New Jersey. Plaintiff also certified that when they appeared before a judge the morning after the writ had been executed, defendant knowingly misrepresented the record of the family action in material respects. Further, plaintiff asserted that in the settlement negotiations that followed, defendant used the writ as a means of attempting to coerce plaintiff to pay defendant his legal fees and to pay the wife the full amount of her demands:
20. Almost immediately the following week, Mr. Auty contacted my attorneys and stated that he wanted to "settle" the matter right away. We went to a meeting at his offices and there, for the first time, his design became clear. He demanded that I transfer control of the funds which were allocated to our son's education and he demanded cash from me, suggesting that I could pay him in lieu of attorney fees. I refused to agree to either demand. He threatened me directly, there and in subsequent "settlement" meetings, saying that if I did not capitulate he would move to enforce his "Writ of Ne Exeat" and put me back in the jail. He conveyed the impression that he had control of the judge and could get his way whenever he wished.
21. I was frightened by him, but I refused to accede to his demands. The meeting ended without an agreement. He then wrote a letter to my attorneys with a settlement agreement enclosed. In the letter, he said that if I did not sign the agreement he would move to enforce the writ. I instructed my attorneys in writing not to settle anything with Mr. Auty. We began preparations to litigate the Writ of Ne Exeat.
In the letter in question, apparently written after an oral settlement had been reached, defendant wrote to plaintiff's attorney, "If my client does not have the [settlement] monies by Friday, February 24, 1984, then I shall move to enforce the Writ."
The purpose of a writ of ne exeat is to compel a defendant's physical appearance in court when required. Perlmutter v. DeRowe, 58 N.J. 5, 16 (1971). After arrest the defendant may be released upon posting bail in an amount calculated to insure his presence. Pressler, Current N.J. Court Rules, Comment R. 4:51. The writ should be resorted *549 to only when it can be shown that a defendant poses a real threat to abscond. In the absence of such a threat, the writ may not be used as a means of coercing payment of a debt, no matter how just, nor as a means of punishment, no matter how deserved.
An action for malicious abuse of process will lie against one who uses a writ after its issuance solely to coerce or injure the defendant. The tort is defined in Ash v. Cohn, 119 N.J.L. 54, 58 (E. & A. 1937), where it is distinguished from the tort of malicious use of process (the civil equivalent of malicious prosecution):
An action for malicious abuse of process is distinguished from an action for malicious use of process in that the action for abuse of process lies for the improper, unwarranted and perverted use of process after it has been issued while that for the malicious use of it lies for causing process to issue maliciously and without reasonable or probable cause. [Citation omitted.] Thus it is said, in substance, that the distinction between malicious use and malicious abuse of process is that the malicious use is the employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law.
Courts do not favor actions for malicious use of process because of judicial indulgence accorded a person who resorts to court process for its intended purpose even though he did not have probable cause to do so. Because it is often difficult to distinguish between a plaintiff who is naive and a plaintiff who is a knave, courts protect both indiscriminately by requiring a plaintiff bringing an action for malicious use of process to prove not only that the defendant brought the underlying action without probable cause, but also that it was actuated by malice, has been terminated favorably to plaintiff, and that plaintiff suffered a special grievance. The Penwag Property Co., Inc. v. Landau, 148 N.J. Super. 493, 500 (App.Div. 1977), aff'd, 76 N.J. 595 (1978).
It is important to distinguish the tort of malicious use of process from the tort of malicious abuse of process because the latter does not require a plaintiff to prove the elements of the *550 former. To preserve the distinction between the two torts, we have emphasized that process has not been abused unless after its issuance the defendant reveals an ulterior purpose he had in securing it by committing "further acts" whereby he demonstrably uses the process as a means to coerce or oppress the plaintiff. Gambocz v. Apel, et al., 102 N.J. Super. 123, 130-131 (App.Div. 1968), certif. den., 52 N.J. 485 (1968).
We add that where there is a genuine issue as to whether a defendant's "further acts" were maliciously intended as an abuse of process, the plaintiff may demonstrate that the defendant had secured issuance of the process without reason or probable cause as evidence that his ultimate intent was to use it for a purpose ulterior to the one for which it was designed. See Soos v. Soos, 14 N.J. Misc. 381, 386 (Ch. 1936), where in a proceeding for divorce on the ground of extreme cruelty the court explained why it considered evidence of the defendant's alleged acts of cruelty even though they occurred within the statutory "cooling-off" period before the complaint was filed when such acts may not be considered as constituting the ground for divorce:
Assuming always that the defendant's acts which occurred within the proscribed period are set up in the petition not as in themselves or in conjunction with the defendant's earlier acts constituting the cause of action, may not evidence of such later acts be admitted and considered by the court as giving character to the earlier acts, without doing violence to the statutory proviso? Is not the nature of the offence of extreme cruelty such as to justify and sometimes require a consideration of all of the defendant's acts down to and including the pendency of the suit, as tending to corroborate, explain or characterize the acts upon which the cause of action is based? Such has been the established rule in actions for divorce from bed and board for extreme cruelty and in separate maintenance suits based upon extreme cruelty. [Citations omitted.] So that unless the term "extreme cruelty" has acquired a different connotation under the Blackwell act [the divorce statute then in effect] the same rule should be applied.
Treating plaintiff's evidence indulgently, as we must on a defendant's motion for summary judgment, we conclude that the motion should have been denied. Judson v. Peoples Bank *551 & Trust Co. of Westfield, 17 N.J. 67, 74-75 (1954). Plaintiff certified that after the writ had issued defendant knowingly and materially misrepresented to a judge the record of the family action to justify setting bail in the amount of the wife's demands and used the threat of reincarceration under the writ as a means of extorting a settlement and payment of counsel fees from plaintiff. Those "further acts" by defendant, if they occurred, establish the characteristic element of an abuse of process.
To give character to the evidence of defendant's "further acts," the court could properly have considered plaintiff's circumstantially detailed statements that defendant acted out of malice in obtaining the ne exeat on the basis of statements in the wife's certification that he knew were materially false. The duty to represent a client does not shield an attorney from the consequences of offering evidence that he knows is false. RPC 3.3(a)(4). Defendant offered no evidence in support of his motion for summary judgment other than excerpts from the record of prior proceedings. He did not deny by certification that he committed the "further acts" alleged by plaintiff or that he had used the writ to extort a settlement that included the payment of his fee.
The trial judge, though skeptical of plaintiff's claim that he felt intimidated by defendant's threats, accepted the truth of plaintiff's assertions in view of the standards to be applied in considering a motion for summary judgment. The judge nevertheless granted defendant's motion for a reason that the parties had not argued then, and do not argue now. In the affidavit in support of her application for the ne exeat, the wife stated in part:
9. On October 26, 1983, a deposition of the [plaintiff] was conducted at the office of Breslin and Auty, Esqs., pursuant to Notice of Deposition resulting from Judge Krafte's original Order setting this matter down for Plenary Hearing on the issues of continued alimony. At the time of this deposition, the *552 [plaintiff] advised me and my attorney for the first time that in the spring of 1982, he had caused mortgages to be placed upon the house in an amount exceeding the equity then available for me and my son and the proceeds of these mortgages were utilized for the purpose of paying various debts that he owed as well as living expenses.
10. What the [plaintiff] did was to take a Deed which he was allegedly to hold in trust until I received the proceeds that I was entitled to and utilized the conveyance for the purpose of mortgaging the Washington, D.C. property to the full extent of its equity and thereafter, utilizing the mortgage proceeds to pay personal obligations.
The trial judge accepted the wife's statements at face value[2] and concluded from them that by obtaining her deed without revealing that he would use it to refinance the Washington property to pay personal debts, plaintiff had committed a fraud thereby entitling the wife to a writ of capias ad respondendum. N.J.S.A. 2A:15-42d. As the judge saw it, even if the wife was not entitled to a writ of ne exeat, plaintiff suffered no harm because she was entitled to a capias that would have produced the same result.
The wife did not seek a capias. It is debatable whether a court would have issued one if she had. It may be that plaintiff was devious in his dealings with the wife and that he temporized in paying her her share of the Washington property, but this case turns on what defendant did, not on what he might have done or on what plaintiff might have deserved. Moreover, the issue before the trial judge was not whether defendant misused process, be it a ne exeat or a capias, but whether he abused it after its issuance.
Reversed and remanded for further proceedings.
NOTES
[1] We have not been furnished with a complete record of the family action and therefore must proceed in some instances by what it appears to contain.
[2] As noted above, in his February 1982 certification plaintiff expressly stated that he needed the wife's interest in the Washington property to enable him to refinance it to raise cash to pay personal debts and alimony payments. Plaintiff cites as another example of defendant's deliberate use of false evidence, the portion of the wife's affidavit defendant prepared that states she was unaware that plaintiff would use her deed to him as a means of refinancing the Washington property.