768 A.2d 825 (2001)
338 N.J. Super. 282
Thomas BAGLINI, Jo Ann Baglini, Erich Pfisterer, Melitta Pfisterer, Paul Koren, Bernadine Koren, David Parvin, and Melanie Parvin, Plaintiffs-Respondents/Cross-Appellants,
v.
Frank LAULETTA and University Executive Campus, Inc., Defendants-Respondents, and
Jeffrey I. Baron, Esquire and Baron & Riefberg, a professional corporation, Defendants-Appellants/Cross-Respondents.
Thomas Baglini, Jo Ann Baglini, Erich Pfisterer, Melitta Pfisterer, Paul Koren, Bernadine Koren, David Parvin, and Melanie Parvin, Plaintiffs-Respondents/Cross-Appellants,
v.
Frank Lauletta and University Executive Campus, Inc., Defendants-Appellants/Cross-Respondents, and
Jeffrey I. Baron, Esquire and Baron & Riefberg, a professional corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2001.
Decided March 30, 2001.
*827 Paul A. Snyder, Cherry Hill and Robert E. Rochford, argued the cause for appellants/cross-respondents Jeffrey I. Baron and Baron & Riefberg in A-907-98T2 (Marshall, Dennehey, Warner, Coleman & Goggin, and Winne, Banta, Rizzi, Hetherington *828 & Basralian, attorneys, Hackensack; Mr. Snyder and Lawrence Berg, Cherry Hill, on the main brief; Mr. Rochford, on the punitive damages brief).
John C. Eastlack, Jr., Turnersville, argued the cause for appellants/cross-respondents Frank Lauletta and University Executive Campus, Inc. in A-1606-98T3 (Mr. Eastlack, on the brief).
Dennis J. Crawford, Haddonfield, argued the cause for respondents/cross-appellants Thomas and Jo Ann Baglini and Paul and Bernadine Koren in A-1606-98T3; and Joseph A. Del Duca argued the cause for respondents/cross-appellants Erich and Melitta Pfisterer and David and Melanie Parvin in A-1606-98T3 (Duffy & Quinn and Madden, Madden & Del Duca, attorneys; Mr. Del Duca, Mr. Crawford and Heather Azoulay, on the joint brief).
Before Judges HAVEY, WEFING and CUFF.
*826 The opinion of the court was delivered by HAVEY, P.J.A.D.
These are consolidated appeals[1] from a judgment entered on a jury verdict in plaintiffs' favor against defendants University Executive Corp., Inc. (UEC), Frank Lauletta (UEC's principal), Jeffrey I. Baron, Esquire, and Baron & Riefberg, P.C.
Plaintiffs protested the development application made by UEC and Lauletta to construct office condominiums in Washington Township, Gloucester County. Displeased with these protests, UEC and Lauletta filed an action against plaintiffs sounding in defamation, interference with business advantage, and malicious use of process (the Lauletta complaint). Baron represented UEC and Lauletta in that action, which was voluntarily dismissed prior to trial. In turn, plaintiffs filed the present action charging all defendants with malicious abuse of process, malicious use of process, and intentional and negligent infliction of emotional distress. The trial court granted defendants summary judgment dismissing the malicious use of process count, concluding that plaintiffs had failed to demonstrate a "special grievance." The court also dismissed the intentional and negligent infliction of emotional distress claims. The jury returned a verdict in favor of plaintiffs on their malicious abuse of process claim, awarding compensatory and punitive damages to plaintiffs.
On appeal, UEC and Lauletta argue that plaintiffs failed to establish a malicious abuse of process cause of action as a matter of law because: (1) defendants did not commit "further acts" after filing the Lauletta complaint; and (2) the statements plaintiffs contend constituted "further acts" were protected by the litigation privilege. We agree with defendants on both points. We therefore reverse and vacate the judgment against defendants.
Plaintiffs cross-appeal, arguing that the trial court erred in granting defendants summary judgment on their malicious use of process claim. We agree and accordingly reverse and remand for further proceedings.
In 1988, UEC contracted to purchase an eleven-and-one-half acre tract in Washington Township, conditioned upon obtaining governmental approvals to construct an office condominium complex. Construction of the complex required a rezoning of the tract from residential to highway/commercial use. After a favorable recommendation by the Planning Board on February 16, 1989, the Township Council rezoned the property to highway/ commercial. Thereafter, the Planning Board granted minor subdivision and site plan approvals. UEC obtained financing and began constructing the project in early 1990.
Plaintiffs became aware of UEC's project in early 1990. Thereafter, regular weekly meetings were held by neighbors, including several of the plaintiffs, to discuss the project. The neighbors, including *829 some of the plaintiffs, also attended Council and Planning Board meetings, voicing their concerns about the project. The neighbors learned that Lauletta had "close" ties with the then Mayor of Washington Township, Jerry Luongo. Lauletta and his wife Jacqueline actively campaigned for Luongo in the Mayor's race and had contributed to his campaign. After Luongo was elected, Jacqueline was retained as his aide. At the time of trial, Jacqueline was still the Mayor's aide at an annual salary of $35,000, and was also his chief-of-staff in his Assemblyman capacity at an annual salary of $12,000.
Several plaintiffs contacted various governmental agencies concerning the project, including the Department of Environmental Protection (DEP), the County Soil Conservation Agency, and the United States Army Corps of Engineers (Corps). Plaintiff Bernadine Koren, who had long been politically active in the Township, spoke against the project to individual Council members. In March and April 1990, Lauletta received notice from the DEP and the Corps that the plans for the project might violate fresh water wetlands regulations. Necessary permits were eventually issued.
On March 28, 1990, plaintiff Melanie Parvin and others authored a letter stating that Lauletta had received favorable treatment from the Township on other development applications. The letter implied that the preferential treatment was due to Lauletta's close personal relationship with the Mayor, and mentioned that Lauletta's wife was the Mayor's employee. It also claimed that UEC's condominium project was being built on wetlands and that UEC's engineer was currently under investigation by the State relating to the engineer's work on Lauletta's other projects. The letter was signed by plaintiffs Melanie Parvin, Bernadine Koren, David Parvin and Jo Ann and Thomas Baglini. It is unclear to whom the letter was sent.
In May or June 1990, UEC's then-attorney overheard Bernadine Koren tell an unsuccessful applicant at a Planning Board meeting that "it's too bad your name's not [Lauletta] ... you could get anything you want...." Others heard Bernadine say "[w]e're going to get those dagos." On another occasion, she stated "I wonder who he paid off for that one" and "[t]hat M F'er is paying everybody off." Bernadine denied making the latter two statements.
In March 1990, plaintiffs and the other neighbors hired John Trimble, Esquire, to represent their interests in opposing UEC's project. In July 1990, plaintiffs Erich Pfisterer, Jo Ann Baglini and Melanie Parvin, filed a prerogative writs action naming the Township, the Mayor, the Council and Planning Board as defendants, challenging the rezoning of the tract. All of the plaintiffs and many neighbors contributed to the payment of Trimble's counsel fees. In response to the complaint, Lauletta met with Baron, his attorney. Lauletta told Baron that he stood to lose over $1 million if plaintiffs prevailed in the suit. It was Baron's view that the prerogative writs complaint was baseless, and suggested that Lauletta compile a list of expenses associated with the project. As a result of the prerogative writs action, UEC's bank froze one construction loan and canceled another. It was necessary for UEC to borrow money from others to continue the project. Lauletta and UEC intervened in the prerogative writs action after submitting to the court a certification stating that UEC had spent $1,185,000 in reliance on the rezoning of the property.
Lauletta testified that Baron told him he and UEC might have a cause of action against plaintiffs for defamation and unlawful interference with prospective economic advantage. Before drafting a complaint against plaintiffs, Baron researched the relevant causes of action and refreshed his recollection regarding the Noerr Pennington[2] doctrine. He concluded that the *830 doctrine did not apply to certain kinds of speech, such as defamation and contacts with governmental agencies on other projects. He was also aware of the sham exception that excludes from the doctrine baseless claims.
On UEC's and Lauletta's behalf, Baron filed an eleven-count complaint against plaintiffs charging defamation, malicious interference with economic advantage and business relations, malicious abuse of process, interference with economic advantage and business relations, fees under the frivolous complaint statute, N.J.S.A. 2A:15-59.1, and civil conspiracy. UEC and Lauletta demanded compensatory damages in excess of $1 million in each count of the complaint, punitive damages, attorneys' fees and costs.
During the course of construction of the project, UEC had hired Anthony Alberto as the construction manager for the project. Also, an agreement dated March 5, 1990, provided for Alberto's purchase of a ten percent interest in UEC for $80,000. In January 1991, Lauletta observed Trimble representing Alberto before the Planning Board on an application to develop a piece of property. Lauletta told Baron about this because Lauletta thought Trimble might be in a possible conflict of interest, since Alberto was an investor in UEC. During a February 1, 1991 deposition given during the Lauletta complaint litigation, Lauletta advised Trimble that Alberto was a stockholder in UEC. Trimble expressed surprise. At that point Baron stated:
Let the record reflect it came to my attention yesterday Mr. Alberto is Mr. Trimble's client, that he is a member of Executive Campus, Inc., and owns ten percent of that entity so that there will be no question within the next ten days we would like some indication [what] Mr. Trimble's position is, or we will make a motion to disqualify Mr. Trimble in these proceedings based on the ground he sued one of his clients.[3]
Trimble later confirmed with Alberto that Alberto had in fact invested money in UEC. Alberto refused to waive any conflict of interest. Accordingly, Trimble withdrew as plaintiffs' attorney as of February 12, 1991.
However, prior to withdrawing as counsel, Trimble met with Baron to discuss settlement of the prerogative writs suit and the Lauletta action against plaintiffs. Mutual dismissal of the complaints was discussed. Trimble also wanted UEC to increase the buffer between the project and neighboring homes. The settlement discussions were unsuccessful.
In December 1991, the Law Division granted plaintiffs summary judgment in the prerogative writs action, finding that the rezoning ordinance was void due to the Township's failure to revise its master plan. The Township was given until April 15, 1992 to readopt the rezoning ordinance properly, at its discretion. Thereafter, Council members recommended to Lauletta that he drop his lawsuit against plaintiffs as a good will gesture. Lauletta announced his intention to dismiss the suit at a public meeting in March 1992. Thereafter, the Lauletta suit was voluntarily dismissed with prejudice as to any "past claims" against plaintiffs.
In July 1993, the parties settled the rezoning dispute. It was agreed that the front portion of the UEC tract would be zoned highway/commercial, the Baglinis would grant UEC a twenty-foot storm sewer easement and UEC would pay the Baglinis $12,500 in exchange for the Baglinis' dismissal of any claims they had relating to damage to their property.
Plaintiffs, on July 21, 1992, filed the instant action against Lauletta and UEC charging that defendants filed their prior complaint against plaintiffs seeking to silence *831 their objections to the condominium project and to coerce plaintiffs into withdrawing their prerogative writs action challenging the approval. The complaint asserted malicious abuse of process, malicious use of process, intentional and negligent infliction of emotional distress, and the filing of a frivolous lawsuit under N.J.S.A. 2A:15-59.1. Plaintiffs sought punitive and compensatory damages, costs and attorneys' fees. On October 18, 1996, plaintiffs amended their complaint adding Baron and his law firm as party defendants.
The trial court granted defendants summary judgment dismissing plaintiffs' claim of malicious use of process as well as the frivolous lawsuit claims. A consent order was entered dismissing the negligent and intentional infliction of emotional distress claims by all the plaintiffs except Jo Ann Baglini. However, the court denied defendants' summary judgment motion on the malicious abuse of process and punitive damage claims.
After the close of plaintiffs' case during the jury trial, the trial court dismissed the intentional and negligent infliction of emotional distress claim by plaintiff Jo Ann Baglini. The court denied defendants' motion for involuntary dismissal of the malicious abuse of process claim. The jury found that defendants had abused the legal process and that this abuse had injured each of the eight plaintiffs resulting in ascertainable losses in the amount of $75,000 each, except for Jo Ann Baglini, who was awarded $125,000. The jury also found that defendants' conduct was malicious or that they acted in willful and wanton disregard of plaintiffs' rights. A subsequent hearing on punitive damages was conducted after which plaintiffs were awarded $350,000 collectively in punitive damages against Lauletta, $150,000 against UEC, $200,000 against Baron, and $50,000 against Baron & Riefberg. On defendants' post-judgment motions seeking remittitur, the trial court reduced the punitive damages against Baron to $100,000 and against UEC to $89,309.

I
Defendants argue that the trial court erred in denying their motion for involuntary dismissal at the close of plaintiffs' case of the malicious abuse of process claim.
The gist of the tort of malicious abuse of process is not commencing an action without justification, as in malicious use of process (or malicious prosecution). Rather, it is the misuse, or "misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance." Prosser & Keeton on Torts § 121 at 897 (5th ed.1984) (footnote omitted; emphasis added). The Court of Errors and Appeals succinctly described the difference between a misuse and abuse of process in Ash v. Cohn, 119 N.J.L. 54, 58, 194 A. 174 (E. & A.1937) as follows:
An action for malicious abuse of process is distinguished from an action for malicious use of process in that the action for abuse of process lies for the improper, unwarranted and perverted use of process after it has been issued while that for the malicious use of it lies for causing process to issue maliciously and without reasonable or probable cause. Thus it is said, in substance, that the distinction between malicious use and malicious abuse of process is that the malicious use is the employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law.

[Citation omitted.]
Consequently, basic to the tort of malicious abuse of process is the requirement that the defendant perform "further acts" after issuance of process "which represent the perversion or abuse of the legitimate purposes *832 of that process." Penwag Prop. Co., Inc. v. Landau, 148 N.J.Super. 493, 499, 372 A.2d 1162 (App.Div.1977), aff'd, 76 N.J. 595, 388 A.2d 1265 (1978) (citing Gambocz v. Apel, 102 N.J.Super. 123, 130, 245 A.2d 507 (App.Div.), certif. denied, 52 N.J. 485, 246 A.2d 447 (1968)). "In the absence of some coercive or illegitimate use of the judicial process there can be no claim for its abuse." Penwag, supra, 148 N.J.Super. at 499, 372 A.2d 1162. Thus, "[i]f the process is not used at all no action can lie for its abuse." Earl v. Winne, 34 N.J.Super. 605, 615, 112 A.2d 791 (Law Div.1955).
Further acts which lend themselves to an abuse of process include "attachment, execution, garnishment, sequestration proceedings, arrest of the person and criminal prosecution and even such infrequent cases as the use of a subpoena for the collection of a debt." Prosser & Keeton on Torts, supra, § 121 at 899 (footnotes omitted). In Tedards v. Auty, 232 N.J.Super. 541, 551, 557 A.2d 1030 (App. Div.1989), for example, we reversed a summary judgment in defendant's favor where plaintiff charged abuse of process by defendant, an attorney, who obtained a writ ne exeat in a matrimonial enforcement action resulting in plaintiff's incarceration. The "further acts" of defendant after the writ was issued were his knowing and material misrepresentations to a judge of the record of the family action to justify the setting of a substantial bail before plaintiff's release after the ne exeat was served. Ibid.
Here, in denying defendants' motion to dismiss the abuse of process claim, the trial court concluded that plaintiffs had established the necessary "further acts." The court pointed first to Baron's pronouncement during Lauletta's deposition that Trimble might have a conflict of interest, which, the court reasoned, may have been motivated to force Trimble to withdraw and place the plaintiffs in a position where they would effectively be without counsel. The court also identified as a "further act" Baron's suggestion during the settlement conference with Trimble that the parties mutually dismiss their respective lawsuits. The court observed that "giving every reasonable inference to the plaintiffs' case, [it] could be viewed as a threat to pursue this litigation against plaintiffs in an attempt to coerce or extort them into dismissing the prerogative writ actions."
We first address Baron's statement during the deposition to Trimble that Trimble may have a conflict of interest. RPC 1.7 forbids an attorney from representing a client "if the representation of that client will be directly adverse to another client" or "if the representation of that client may be materially limited by the lawyer's responsibilities to another client...." Lauletta saw Trimble representing Alberto, who Lauletta knew was the general contractor for the project and an investor in UEC. Unknown to Lauletta at the time, Alberto was also Trimble's business partner in a real estate land development deal. Soon after Lauletta informed Baron, Baron raised the issue with Trimble at the deposition taken on February 1, 1991. Baron asked that Trimble indicate his position on the issue within ten days and after that Baron would move to disqualify Trimble. Thus, Baron gave Trimble ten days to investigate the possible conflict. Trimble then spoke to Alberto, who told him that he had invested in UEC and that he was unwilling to waive any conflict of interest.
Baron's statement at the deposition that Trimble might have a conflict cannot be considered a "further act" because Baron had a reasonable belief that there was a conflict. Baron was not using the Lauletta lawsuit to "coerce or injure" plaintiffs. Tedards v. Auty, supra, 232 N.J.Super. at 549, 557 A.2d 1030. He gave Trimble a reasonable opportunity to investigate the possible conflict. Once Trimble discussed the matter with Alberto, Trimble agreed with Baron's assessment that he had a possible conflict and therefore withdrew.
*833 Indeed, it could be argued that Baron was doing plaintiffs a service, since an attorney with a conflict may not be able to fully represent his or her own clients. Baron was also certainly doing Trimble a service in pointing out to him a potential violation of the ethical rules.[4] Accordingly, Trimble could not ethically continue to represent plaintiffs in their prerogative writs action and defend plaintiffs against the Lauletta suit.
The second "further act" identified by the trial court was Baron's offer to dismiss the Lauletta suit in return for dismissal of the prerogative writs action during a settlement conference. We disagree. Offers and counter-offers are made during settlement conferences every day. It is a frequent occurrence for a party to offer to dismiss a claim or even a separate complaint, in return for an opposing party dropping their own claim or complaint. Baron's offer of settlement contrasts sharply with the type of wrongful acts that were found to be a malicious abuse of process in Tedards which involved the actual wrongful imprisonment of the opposing party.
Further, as a policy matter, it would be unwise to make it a tort to assert such an otherwise unremarkable position at a settlement conference. As stated in Ruberton v. Gabage, 280 N.J.Super. 125, 133-34, 654 A.2d 1002 (App.Div.), certif. denied, 142 N.J. 451, 663 A.2d 1358 (1995) (quoting Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 564, 117 A.2d 889 (1955)):
[D]uring such [settlement] conferences an attorney must be free to advance the strengths of his or her client's case in a candid and objective way, unfettered by the fear that the attorney may be the subject of a tort action, whether sounding in defamation or any other "action under a different label."
It is the strong public policy of this State to encourage settlement of litigation. Zuccarelli v. State, Dep't of Envtl. Prot., 326 N.J.Super. 372, 380, 741 A.2d 599 (App. Div.1999), certif. denied, 163 N.J. 394, 749 A.2d 368 (2000).
Even if we deemed the two incidents cited by the trial court as "further acts," we are satisfied that the acts were protected by the litigation privilege, which grants an absolute privilege to statements or communications made by attorneys in the course of judicial and quasi-judicial proceedings. Hawkins v. Harris, 141 N.J. 207, 214-15, 661 A.2d 284 (1995). To be privileged, the communication must: (1) be made in judicial or quasi-judicial proceedings; (2) be made by litigants or other participants authorized by law; (3) be made to achieve the objects of the litigation; and (4) have some connection or logical relation to the action. Id. at 216, 661 A.2d 284. The privilege is not limited to statements made at trial; "`it extends to all statements or communications in connection with the judicial proceeding.'" Ibid. (quoting Ruberton, supra, 280 N.J.Super. at 133, 654 A.2d 1002).
We reject plaintiffs' argument that the litigation privilege is not applicable to malicious abuse of process causes of action. In Rainier's Dairies, supra, 19 N.J. at 564, 117 A.2d 889, a defamation action, the Court observed: "If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label." The one tort excepted from the reach of the litigation *834 privilege is malicious prosecution, or malicious use of process. Id. at 564-66, 117 A.2d 889. But the Rainier's Court made no such exception in the case of a malicious abuse of process.
In Ruberton, supra, 280 N.J.Super. at 132-34, 654 A.2d 1002, we specifically applied the litigation privilege in an abuse of process case. There, we held that a lawyer's statements at a settlement conference were protected by the privilege from a subsequent tort action of malicious abuse of process. Id. at 134, 654 A.2d 1002. The lawyer representing the defendant-employer in the original employment litigation had threatened during a settlement conference that defendant might institute criminal charges against the plaintiff-employee. Id. at 128-29, 654 A.2d 1002. We found that this statement was privileged because it was "unquestionably made during the course of a judicial proceeding," reasoning that counsel must be free to advance his or her client's case in a candid way. Id. at 133-34, 654 A.2d 1002.
In its reported opinion, the trial court here stated its view that Ruberton is distinguishable because there the settlement conference was in furtherance of resolving a meritorious claim, whereas here the meritorious nature of the Lauletta complaint is debatable. Baglini v. Lauletta, 315 N.J.Super. 225, 233-34, 717 A.2d 449 (Law Div.1998). The problem is that the trial court presupposed that the Lauletta complaint was without merit. The issues raised in that complaint, of course, were never litigated because it was voluntarily dismissed.
Moreover, making such a distinction is contrary to the purpose of the privilege. "The trouble with privileges is that they are granted to good and bad alike." Hawkins, supra, 141 N.J. at 213, 661 A.2d 284. The privilege promotes the unfettered expression that is critical to the administration of justice. Such freedom would be defeated if participants in the process feared later tort liability. Id. at 213-14, 661 A.2d 284. The policy underpinnings to the privilege would be undermined if its application is dependent upon a trial court's speculation as to the merits of the underlying suit. For example, the trial court here stated that if the settlement conference had been called in order to settle the prerogative writs action, rather than the Lauletta suit, then Baron's statement during the conference would have been privileged. Baglini, supra, 315 N.J.Super. at 234, 717 A.2d 449. It would be extraordinary if the application of the privilege were to turn on such a fine and questionable distinction.
The litigation privilege applies here because the "communications" were made by the attorney for a litigant authorized to make them, were intended to achieve the objectives of the litigation, and had a logical relation to the Lauletta litigation and the prerogative writs case. Hawkins, supra, 141 N.J. at 216, 661 A.2d 284. Accordingly, since plaintiffs failed to demonstrate "further acts," the trial court erred in denying defendants' motion for an involuntary dismissal pursuant to Rule 4:37-2(b). We therefore reverse and vacate the judgment entered on plaintiffs' malicious abuse of process claim.

II
Plaintiffs assert on their cross-appeal that the trial court erred in granting defendants summary judgment dismissing their malicious use of process claim.
A plaintiff in a malicious use of process case must prove four elements: that the original action complained of (1) was brought without probable cause; (2) was actuated by malice; (3) was terminated favorably to plaintiff; and (4) that plaintiff suffered a special grievance. LoBiondo v. Schwartz, 323 N.J.Super. 391, 423, 733 A.2d 516 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1211 (1999). The tort of malicious use of process is disfavored out of fear that its use could chill free access to the courts. Tedards, supra, 232 N.J.Super. at 549, 557 A.2d 1030.
*835 "Because it is often difficult to distinguish between a plaintiff who is naive and a plaintiff who is a knave, courts protect both indiscriminately...." Ibid. The elements of the tort place severe restrictions on a plaintiff's ability to recover, thus recognizing the counter-policy of free access to judicial bodies. Rainier's Dairies, supra, 19 N.J. at 564, 117 A.2d 889.
On defendants' summary judgment motion, they argued that plaintiffs had failed to show a special grievance. Plaintiffs countered that they had suffered the special grievance of having their First Amendment right to petition the government chilled. The trial court agreed with defendants, observing:
I'm satisfied there are not federal constitutional rights implicated here because there isn't any state action. I'm also satisfied that plaintiffs' First Amendment rights were not chilled. The Lauletta lawsuit strengthened plaintiffs' resolve, if anything. They did petition for redress through the judicial branch and they met with significant success. I don't see how it can be construed that their rights were trampled and I don't think that the element of special grievance has been established as a matter of law....
The concept of special grievance is an "elusive concept." LoBiondo, supra, 323 N.J.Super. at 423, 733 A.2d 516. It has been defined as consisting of "interference with one's liberty or property." Penwag, supra, 76 N.J. at 598, 388 A.2d 1265. If plaintiffs' only damages consist of costs of defending the original suit, then the special grievance requirement is not met. Ibid.
Protecting a citizen's constitutional right to protest and communicate respecting public issues has been recognized in other but analogous settings. See United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (the socalled Noerr-Pennington doctrine) (holding that the collusive use by competitors of legislative, administrative or judicial process does not, without more, give rise to antitrust violations); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3rd Cir.1988) (holding that defendants could not be held tortiously liable for calling nursing home violations to the attention of governmental authorities and in soliciting public interest in the violations); Village Supermarket, Inc. v. Mayfair Supermarkets, Inc., 269 N.J.Super. 224, 229-32, 634 A.2d 1381 (Law Div.1993) (holding that objectors to competitor's planning board application were immune under the Noerr-Pennington doctrine to claims of intentional interference with prospective economic contractual and economic advantages); Sierra Club v. Butz, 349 F.Supp. 934, 939 (N.D.Cal.1972) (holding that persons who persuaded the U.S. Forest Service to abandon timber sales in order to protect the wilderness were protected by the First Amendment right to influence governmental action); see also LoBiondo, supra, 323 N.J.Super. 391, 414, 733 A.2d 516; Fraser v. Bovino, 317 N.J.Super. 23, 37, 721 A.2d 20 (App.Div.1998), certif. denied, 160 N.J. 476, 734 A.2d 791 (1999), and cases cited therein.
In LoBiondo, decided after trial of this matter, an objector vigorously protested a land-use application to expand a nearby beach club. 323 N.J.Super. at 395, 733 A.2d 516. The applicant filed an action against the objector, claiming defamation and malicious interference with business advantage. Id. at 395-96, 733 A.2d 516. We held that the objector could demonstrate a "special grievance" in the context of malicious use of process because of the chilling effect the applicant's complaint had upon her First Amendment freedom of speech and right to protest. Id. at 422, 733 A.2d 516. We declined the objectors' invitation to create a new cause of action, *836 the so-called SLAPP[5]-back suit, id. at 417-22, 733 A.2d 516, concluding that "the familiar cause of action of malicious use of process will do just as well." Id. at 422, 733 A.2d 516. We determined that a reasonable jury could have found that the protestor satisfied three elements of malicious use of processlack of probable cause, actuated by malice, and favorable termination. Id. at 423, 733 A.2d 516. As to the "somewhat problematical" element of special grievance, we cited Penwag's holding that a special grievance consists of "interference with one's liberty or property," 76 N.J. at 598, 388 A.2d 1265, and observed:
In the context of litigation of this sort, we do not read "interference with one's liberty" as embracing only physical freedom of movement and hence as limited to restraint on that freedom. Rather, we interpret "liberty" as including the entire bundle of freedoms afforded by the Constitutionincluding freedom of speech and freedom to petition. And we are convinced that the challenge to those freedoms attendant upon the filing of what may be conveniently referred to as a SLAPP suit and the constraint the suit imposes upon the exercise of those freedoms, both intended and thereby achieved, constitute a sufficient interference with one's liberty to satisfy the special grievance element.
[LoBiondo, supra, 323 N.J.Super. at 424, 733 A.2d 516.]
LoBiondo's reasoning and conclusions are sound and directly applicable to the case before us. In the context of a challenge to a land-use approval involving rezoning of the applicant's property, interested parties have a firmly rooted constitutional privilege of speaking out and protesting in good faith against what they perceive to be a legally erroneous legislative use of the governing body's zoning powers. The problem in many cases such as this is "not too much citizen involvement but too little." Brownsville, supra, 839 F.2d at 160. The constraint upon the good-faith exercise of the protestors'" bundle of freedoms" afforded by the Constitution caused by a so-called SLAPP suit may indeed constitute special grievance in the context of a malicious use of process claim.
Here, the day before Lauletta filed the complaint he told plaintiff Jo Ann Baglini that he was going to "be forced to do something to knock [her] socks off." The Lauletta complaint itself repeated ten times a demand of more than $1 million in damages. Plaintiffs testified that upon being served with the complaint, they became "very nervous." Many had trouble sleeping and eating. Others were concerned that they would "go to jail" or lose their homes or be required to withdraw their children from college. The Pfisterers, German immigrants, testified that their belief in the United States Constitution had been shaken by the event. Erich Pfisterer stated that the lawsuit "did its trick...." He concluded "I will definitely not get involved anymore." Melanie Parvin also stated that never again would she get involved with such a protest. Further, after commencement of the suit, Bernadine Koren's active political undertakings in the community dwindled; at the time of trial, "it was down to nothing."
It may be true, as the trial court observed, that plaintiffs continued their prerogative writs complaint even after the Lauletta complaint was served upon them. Indeed, they were successful in setting aside the revisions to the zoning ordinance. However, as we observed in LoBiondo:
We point out that it is not only the defendant in a SLAPP suit who suffers. The common weal is obviously impaired as well since the consequence of a SLAPP suit is not only to silence the defendant but to deter others who might speak out as well. Suppression of public *837 debate on public issues and the placing of a priceoften a high oneon the right to petition for redress is, in our view, special grievance enough.
[323 N.J.Super. at 424, 733 A.2d 516.]
Such impairment of the common weal was demonstrated here. Melanie Parvin testified that the neighbors, who had previously "knocked on doors" and "put some money on the table" in support of the prerogative writs suit just "disappeared ... [;] they headed for the hills" when plaintiffs were served with the Lauletta lawsuit. She stated that "we were poison" to the neighbors. In short, we conclude that the trial court erred in concluding that plaintiffs had not demonstrated a "special grievance."
Of course, a special grievance is not the only element of a malicious use of process claim. In order to reach a jury on this cause of action, plaintiffs will also have to demonstrate sufficient facts from which a reasonable jury could conclude that the initial Lauletta complaint was brought without probable cause, with malice, and that the action was concluded favorably to plaintiffs. As discussed above, this tort is disfavored and the hurdles placed in a plaintiff's way are formidable. We express no opinion as to whether plaintiffs have established a prima facie case as to these elements of a malicious use of process cause of action.

III
Defendants raise an array of additional challenges to the judgment in favor of plaintiffs' on their abuse of process claim. Since we have reversed and vacated the judgment, the challenges are technically moot. However, some of the issues may again arise on remand. We address them briefly.

A
The Baron defendants argue that the trial court erred in having the jury decide whether defendants were subject to punitive damages during the liability and compensatory damage phase of the trial.
During the charge conference at the close of the liability and compensatory damage phase of the trial, defense counsel requested that the question whether defendants were liable for punitive damages not be addressed in the final instruction to the jury. The trial court disagreed and, as part of its general damages instruction, asked the jury to decide "whether punitive damages should be awarded." In that regard, the court asked the jury to consider whether defendants' conduct was malicious or in "willful and wanton disregard of another's rights." In answer to the special interrogatories, the jury concluded that the conduct of all defendants was malicious and in willful and wanton disregard of plaintiffs' rights. In the second phase of the trial, the jury was merely asked to determine the amount of punitive damages awarded against each defendant.
The trial court erred in directing the jury to decide the punitive damage issue during the liability and compensatory damage phase of the proceedings. In Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 342, 627 A.2d 1081 (1993), the Court held that, in a product liability case governed by the Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -7, bifurcated trials are required pursuant to N.J.S.A. 2A:58C-5b[6] which provided:
The trier of fact shall first determine whether compensatory damages are to be awarded. Evidence relevant only to punitive damages shall not be admissible in that proceeding. After such determination has been made, the trier of fact shall, in a separate proceeding, determine *838 whether punitive damages are to be awarded.

[Emphasis added.]
Significantly, the Court stated that although the PLA applies only to product liability cases, "we expect those requirements to govern all claims for punitive damages, even those that arise outside the act." Herman, supra, 133 N.J. at 346, 627 A.2d 1081 (emphasis added).
Moreover, plaintiffs' amended complaint against the Baron defendants was filed after the effective date (October 27, 1995) of the Punitive Damage Act, N.J.S.A. 2A:15-5.9 to -5.17, which provides:
a. Any actions involving punitive damages shall, if requested by any defendant, be conducted in a bifurcated trial.
b. In the first stage of the bifurcated trial, the trier of fact shall determine liability for compensatory damages and the amount of compensatory damages or nominal damages. Evidence relevant only to the issues of punitive damages shall not be admissible in this stage.
....
d. In the second stage of a bifurcated trial, the trier of fact shall determine if a defendant is liable for punitive damages.

[ N.J.S.A. 2A:15-5.13.]
Consequently, in the event the issue of punitive damages is presented to the jury, it shall be instructed first to determine whether compensatory damages are to be awarded. Evidence relevant only to punitive damages shall not be admissible in that phase of the trial. After the compensatory damage issue is decided, the jury shall, in a separate proceeding, determine whether punitive damages are to be awarded.[7]

B
During trial, defendants requested that the jury be instructed to apportion liability among the defendants. The trial court refused to do so because no cross-claims had been filed.
In Young v. Latta, 123 N.J. 584, 586, 589 A.2d 1020 (1991), the Court held that a nonsettling defendant is entitled to a credit under the Comparative Negligence Act, N.J.S.A. 2A:15-5.2, against a settling defendant, whether or not a cross-claim for contribution has been filed. The Young rule logically applies when, as here, there has been no settlement and all of the defendants remain in the case.
However, the Court's holding in Young was not intended to "give a non-settling defendant free rein to assert the liability of a settling defendant without first providing the plaintiff with fair and timely notice." Young, supra, 123 N.J. at 597, 589 A.2d 1020. "A defendant who produces no expert report (whether its own or that of another party) and fails to allege well before trial the causative fault of a co-defendant may be precluded from asserting at trial that co-defendant's fault in the event of a settlement." Ibid.
If the apportionment issue is again raised on remand, the court should first determine whether there is any rational basis for the jury to conclude that the respective fault of each defendant can be apportioned. If so, plaintiff must be given "fair and timely notice" of defendants' intention to request apportionment under the Act. Assuming that such fair and timely notice has been given, defendants will be entitled to an apportionment charge.

C
Defendants also contend that the jury improperly awarded damages to plaintiffs for emotional distress arising out of defendants' malicious abuse of process. The question on remand will be whether such *839 damages may be awarded for a malicious use of process.[8]
In a malicious use of process case, a plaintiff may recover for the harm to his reputation by any defamatory matter alleged as the basis of the proceedings and "any emotional distress that is caused by the proceedings." Restatement (Second) of Torts, § 681 (1976). Emotional distress may be recovered if it:
is of a kind normally to be expected as a result of the proceedings.... There may, however, be emotional distress that is not normal or justified by the proceeding, as when for example the plaintiff worries himself into a state of insomnia and nervous prostration because he is sued for $10 on a grocery bill that he has in fact paid. The exaggerated and unjustified emotional distress is not compensated.
[Id. at § 681 comment f on Clause (e).]
Other authorities have stated that "[i]ntangible, non-pecuniary damages, such as damages to reputation where it can be proven, humiliation or anxiety, emotional distress and the like, can be recovered in addition to the pecuniary losses." Prosser & Keeton on Torts, supra, § 120 at 896. Courts have required little or no proof with regard to intangible damages for malicious use of process, apparently in the belief that a "normal person" subjected to wrongful litigation would have suffered at least some damages. Id. at § 121 at 900. See also Rumbauskas v. Cantor, 138 N.J. 173, 179, 649 A.2d 853 (1994) (stating in dictum that in malicious prosecution cases "some of the major elements of damages are humiliation, embarrassment, mental suffering, and wounded sensibilities"). On remand the trial court should instruct the jury accordingly.

D
Finally, the Lauletta defendants argue that their motion for a directed verdict should have been granted because they could not be held responsible for the actions of their attorney, Baron. They argue that they were not vicariously liable for the "further acts" which Baron committed personallythe statement that Trimble had a conflict of interest and Baron's settlement offer. We need not address this point because we have held that Baron's "further acts" are not actionable. However, to the extent that the vicarious liability issue may be raised on remand, we address it briefly.
"An innocent client should not be held vicariously liable for the wrongful conduct of his or her attorney against the attorney's other clients if the client does not direct, advise, consent to or participate in the attorney's improper conduct." Baldasarre v. Butler, 132 N.J. 278, 292, 625 A.2d 458 (1993). The question, of course, is whether the Lauletta defendants did in fact "direct, advise, consent to or participate in" the alleged improper conduct of Baron in filing the complaint. Resolution of that issue must abide the presentation of evidence during the course of the trial of plaintiffs' malicious use of process contention.
The judgment entered on plaintiffs' malicious abuse of process is reversed and vacated. We reverse the dismissal of the malicious use of process claim and remand for further proceedings.
NOTES
[1] These back-to-back appeals have been consolidated for the purpose of this opinion.
[2] United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).
[3] The record also disclosed that Trimble and Alberto were partners in a land transaction.
[4] It appears that Trimble did in fact have a conflict of interest in representing both plaintiffs and Alberto. Alberto testified that he agreed to purchase a ten-percent interest in UEC on March 5, 1990. He subsequently contributed capital to UEC, including $2,000 on February 12, 1991, eleven days after Baron made the allegation of Trimble's conflict. Moreover, Alberto was the construction manager of the project and thus had a financial interest in the project's continued viability.
[5] SLAPP is an acronym standing for Strategic Lawsuits Against Public Participation, id. at 418, 733 A.2d 516 intending to impose on citizens the expense and burden of defending a lawsuit and thus force them to give up their protest. Ibid.
[6] N.J.S.A. 2A:58C-5b was deleted from the PLA upon adoption of the Punitive Damage Act, L. 1995, c. 142, § 8.
[7] N.J.S.A. 2A:15-5.12b sets forth relevant factors to be considered by the jury in awarding punitive damages. These factors apply as to the Baron defendants.
[8] Plaintiffs' claims of negligent and intentional infliction of emotional distress were dismissed.